**[J-59 A-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

IN RE: MAGISTERIAL DISTRICT JUDGE
MARK A. BRUNO, MAGISTERIAL
DISTRICT 15-1-01

PETITION OF: MARK A. BRUNO

No. 84 MM 2013

Petition to Vacate the Order of the Supreme
Court dated February 1, 2013

ARGUED: September 10, 2013

**OPINION**

|  | DECIDED: August 28, 2014 |
|---|---|
| **MR. CHIEF JUSTICE CASTILLE** | OPINION FILED: October 1, 2014 |

On August 28, 2014, this Court vacated its Order dated February 1, 2013, by which the Court suspended Magisterial District Judge Mark A. Bruno without pay pending further Order of this Court. See In Re: Bruno, --- A.3d ---, 2014 WL 4251283, (Pa. 2014) (*per curiam*). This Opinion follows.

The matter before the Court arises out of our supervisory actions following the 2011 federal investigation and subsequent indictment of Philadelphia Traffic Court personnel on allegations of corruption involving "ticket-fixing."[1] The immediate issue is

---

[1] The federal investigation has resulted to date in the prosecution of nine judges elected, or assigned, to Traffic Court: Michael J. Sullivan, Michael Lowry, Robert Mulgrew, Willie Singletary, Thomasine Tynes, Mark A. Bruno, H. Warren Hogeland, Kenneth Miller, and Fortunato N. Perri, Sr.; administrative personnel: William Hird; and two local businessmen: Henry P. Alfano and Robert Moy. As the federal district court has recounted, the central allegation was that "the Traffic Court was used by the alleged conspirators to give preferential treatment to certain ticketholders, most commonly by 'fixing' tickets for those with whom they were politically and socially connected." See U.S. v. Sullivan, 2013 WL 3305217 (E.D. Pa. July 1, 2013). The cases of Hogeland, Miller, Perri, Hird and Alfano were resolved by plea. The remaining defendants
(continued…)

whether this Court has the power to act and order the interim suspension from the bench of a sitting jurist charged with a felony for conduct on the bench, and particularly whether such authority exists given the formal disciplinary process available, as vested in the Judicial Conduct Board (the "Board") and Court of Judicial Discipline (the "CJD"). This Opinion thus resolves overarching constitutional questions of the Court's authority and jurisdiction with respect to sitting members of the Judiciary. For the reasons that follow, we hold that:

     1.     The Supreme Court has the supervisory power, an aspect of its authority at King's Bench, to order the interim suspension without pay of sitting jurists.

     2.     The Supreme Court has exclusive jurisdiction at King's Bench to resolve the instant dispute, which implicates supervisory actions of the Court relating to personnel of the Unified Judicial System.

     3.     Acting within their respective authorities and jurisdictions, both the Supreme Court and the CJD have authority to issue orders of interim suspension and to impose sanctions upon jurists. To the extent that any such orders ultimately or necessarily conflict, the order of the Supreme Court is "supreme" and controlling.

Aside from foundational issues regarding the Court's power and jurisdiction is the difficult discretionary question of when to exercise the Court's authority. This Opinion discusses the broad considerations attending that question.

## I.     Background

On January 29, 2013, a federal grand jury indicted Judge Bruno in the U.S. District Court for the Eastern District of Pennsylvania ("district court") on felony charges

---

(…continued)
proceeded to a joint trial, which resulted in the outright acquittal of Sullivan, Bruno, and Moy. Mulgrew, Tynes and Lowry were convicted of perjury; Singletary was convicted of making false statements to the FBI.

of criminal conspiracy, mail fraud, and wire fraud. On February 1, 2013, the Supreme Court entered an order, without dissent, that relieved Judge Bruno "of any and all judicial and administrative responsibilities as a judge of the Magisterial District Court" and suspended Judge Bruno "without pay" pending further Order of this Court. The Order issued without prejudice to the right of Judge Bruno to seek relief in this Court for the purposes of vacating or modifying the Order. Order, 2/1/2013 (*per curiam*) ("February 2013 Order").[2] Judge Bruno did not immediately seek such relief.

Meanwhile, on January 31, 2013, the Board filed a petition with the CJD seeking relief similar to that accorded by this Court, the interim suspension without pay of Judge Bruno. The CJD scheduled a telephone conference for February 1, 2013, to consider the Board's petition. According to the Board, around 2:30 P.M. on February 1, 2013, the CJD received notice of this Court's action and, as a result, cancelled its conference and took no immediate action on the Board's petition.

On March 13, 2013, Judge Bruno filed an application for relief in the federal district court seeking declaratory and injunctive relief from this Court's February 2013 Order, on the theory that the Order violated his due process rights. On May 13, 2013, the district court denied the request for a preliminary injunction. See Bruno v. Supreme Court of Pennsylvania, 946 F.Supp.2d 392 (E.D. Pa. 2013). The district court also denied reconsideration. In June and July 2013, Judge Bruno filed several other motions in the district court, which he then withdrew following the directive of this Court to reinstate his pay during his suspension.

---

[2] President Judge James P. MacElree of the Chester County Court of Common Pleas independently suspended Judge Bruno on the day of the indictment. That action is not challenged in this matter.

In parallel, Judge Bruno also responded to the Board's request that the CJD suspend him without pay. The CJD held a hearing on April 8, 2013. On May 24, 2013, nearly four months after Judge Bruno was indicted, the CJD issued an order, accompanied by opinion, suspending Judge Bruno **with** pay. The CJD ordered that any compensation withheld from Bruno since February 2013 be paid immediately to him. See In re Bruno, 69 A.3d 780 (Pa. Ct. Jud. Disc. 2013). The CJD's directive necessarily assumed a power to overturn this Court's prior order.

On May 28, 2013, Judge Bruno filed a petition with the Supreme Court to vacate its February 1, 2013, Order for suspension without pay. The Administrative Office of the Pennsylvania Courts (the "AOPC") entered its appearance as respondent. On June 20, 2013, Judge Bruno filed a petition to expedite decision, in which he requested a hearing before the Court. On July 11, 2013, the Court acted on Judge Bruno's petition to vacate by listing the matter for oral argument. The Court requested briefing and argument on three constitutional issues. The issues briefed are:

> (1) Whether the Pennsylvania Supreme Court has jurisdiction to enter orders of interim suspension of jurists.
>
> (2) Whether the Court of Judicial Discipline has exclusive jurisdiction to enter orders of interim suspension of jurists, or whether the Court of Judicial Discipline's jurisdiction is concurrent with the jurisdiction of the Pennsylvania Supreme Court.
>
> (3) If both tribunals act, which order is supreme.

In re Bruno, 71 A.3d 249 (Pa. 2013) (*per curiam*). The Court also directed the AOPC to recommence paying Judge Bruno's salary retroactive to February 1, 2013, pending resolution of the dispute, albeit we did not vacate our prior order. Finally, the Court invited the Judicial Conduct Board to participate in oral argument. The petition for expedited consideration and a "timely hearing" was dismissed as moot. Id.

On July 25, 2013, upon a joint application by the parties that the Court granted, this matter was consolidated for briefing and argument with the distinct case involving Philadelphia Traffic Court Judge Christine Solomon, a case which was tangentially related to the federal investigation into Traffic Court corruption, but which implicated similar constitutional claims.[3]   In addition, the Court received *amicus curiae* briefs from

---

[3]   We do not dispose of the <u>Solomon</u> matter in this Opinion.   However, our expression necessarily describes and touches upon arguments which the parties illustrate by reference to Judge Solomon's circumstances.   Briefly, the background facts of <u>Solomon</u> relevant to the issues argued by the parties are as follows.

In October 2011, upon notice of the ongoing federal investigation, the First Judicial District of Pennsylvania (comprising Philadelphia County) (the "FJD"), which was already undertaking a reform initiative authorized by this Court, expanded the scope of its autonomous administrative review to encompass Traffic Court operations. The FJD directed the consulting firm it had retained for its reform initiative, Chadwick Associates, to conduct the review.   The immediate goal of the review was to secure and preserve evidence, to facilitate full cooperation with the federal investigation, and to reestablish the probity of Traffic Court operations.   Judge Solomon, who had recently been elected to a vacancy on the Traffic Court, met with the Honorable Gary S. Glazer, Judge of the Philadelphia County Court of Common Pleas, who was serving as the new Administrative Judge of the Philadelphia Traffic Court, and representatives of Chadwick Associates on March 13, April 5, and April 10, 2012.   In November 2012, the FJD released the report prepared by Chadwick Associates ("FJD Report"), which indicated that Judge Solomon had refused to cooperate with the administrative review.

On April 18, 2013, this Court issued a rule to show cause why Judge Solomon "should not be subject to a suspension from her judicial duties without pay for a period of ninety (90) days based upon her refusal to cooperate with the Court-ordered administrative review of the Traffic Court."   The rule was returnable on April 29, 2013. <u>See</u> Order, 4/18/2013 (*per curiam*).   Mr. Justice McCaffery noted his dissent.   Judge Solomon filed an answer to the rule to show cause, challenging the findings of the FJD Report regarding her lack of cooperation.

On May 21, 2013, this Court appointed the Honorable William H. Platt, Senior Judge of the Superior Court of Pennsylvania, to serve as the Court's Special Master in the <u>Solomon</u> matter.   The AOPC would attend the hearings and participate as necessary. The Court retained jurisdiction. <u>See</u> <u>In re Solomon</u>, 66 A.3d 764 (Pa. 2013) (*per curiam*).   On May 31, 2013, Judge Solomon asked the Judicial Conduct Board to (continued…)

the Special Court Judges Association of Pennsylvania (the "SCJAP") and from the Pennsylvania Bar Association (the "PBA").

In August 2014, a federal jury acquitted Judge Bruno of felony charges (criminal conspiracy, mail fraud, and wire fraud) relating to his service on the bench at Philadelphia's Traffic Court. Our Order of August 28, 2014, vacating the February 1, 2013, Order freed Judge Bruno to return to service on the bench. This Opinion now addresses the constitutional issues briefed.

## II.    The Parties' Arguments

The arguments of the Board and Judge Bruno (together, "petitioners") overlap to a significant degree. Essentially, petitioners argue that the Supreme Court lacks power to enter orders suspending jurists and to act otherwise in any matter that may be considered "disciplinary." In these litigants' view, the CJD's jurisdiction is exclusive in these cases. As a result of this theory, the question of which order is supreme when both the CJD and the Supreme Court act should not and would not arise again. The

---

(…continued)

participate in any proceedings relating to the rule to show cause. On June 6, 2013, the Board followed up with a petition filed in this Court to stay proceedings on the rule to show cause or, in the alternative, for permission to intervene in the proceedings before Judge Platt. The Board challenged the Supreme Court's authority to issue a rule to show cause, to act upon the rule, or to appoint a special master. The AOPC responded to the Board's petition.

On July 12, 2013, this Court granted the Board's petition, stayed the proceedings before Judge Platt, and directed the Board to participate in oral argument on the constitutional issues raised regarding the Court's authority to act in the case of Judge Solomon. In the Solomon matter, the constitutional questions are the same as those in the Bruno matter insofar as they relate generally to an order for the suspension of a jurist, whether a disciplinary action is pending or not before the CJD.

AOPC responds that the Pennsylvania Supreme Court has "King's Bench" jurisdiction over the Bruno matter pursuant to its administrative and supervisory authority over the courts and judicial officers of the Unified Judicial System. According to the AOPC, this jurisdiction is concurrent with that of the CJD over disciplinary matters; however, this Court's authority is "supreme," overriding inconsistent directives of the CJD. In addition to the parties' arguments, we also recount those offered by the PBA in analyzing the constitutional issues implicated here. We note that the PBA has filed a particularly helpful brief, which dispassionately addresses the dispute before the Court in the true spirit of "friend of the Court" advocacy.[4]

## A. Petitioners' Arguments

## 1.

Petitioners suggest that the Supreme Court lacks jurisdiction over the Bruno case. According to petitioners, the Court's general supervisory and administrative authority over all courts and magisterial district judges, while broad, does not include any matter implicating judicial discipline.

---

[4] This *sui generis* matter does not present the same prudential concerns of issue preservation and presentation normally posed in cases before the Court. See Anderson v. McAfoos, 57 A.3d 1141, 1149 (Pa. 2012) ("Issue preservation and presentation requirements are enforced in our system of justice for principled reasons . . . as they facilitate the open, deliberate, and consistent application of governing substantive legal principles from the foundation of a case through its conclusion on appellate review. Loose shifting of positions after the entry of judgments by those challenging them disrupts the stability and predictability of the process, fostering the potential for unfairness."). Indeed, the AOPC, which has taken the nominal role of respondent in this matter, has in fact advocated from the role of "friend of the court" rather than of counsel, not having had the opportunity to confer with a "client." The Supreme Court in this sense is not a client of the AOPC in this matter, even while it stands in the position of a quasi-litigant.

Petitioners begin by noting that any authority of this Court over inferior tribunals originates in the King's Bench power, which was first recognized by the Act of May 22, 1722, and is memorialized in the current Pennsylvania Constitution at Article V, Section 10. Board's Brief at 27-29 & nn. 10, 13 (citing PA. CONST. art. V, § 10(a) (1968); 42 Pa.C.S. § 502). According to petitioners, when Article V, Section 10 was drafted in 1968, the power of the Supreme Court was, "at best, loosely defined in the area of judicial discipline." Until 1968, petitioners state, the Constitution did not provide for the discipline of judges short of removal, which was available via one of three exclusive methods: impeachment, address, or conviction for misbehavior in office or of any infamous crime.[5] Petitioners note that the Supreme Court could also exercise "its inherent common law supervisory powers over the entire judicial system" to remove, suspend, or discipline jurists, but that the Court had never squarely addressed the extent of its disciplinary authority. This authority, petitioners assume, was never applied, it was "untried and untested," and, as a result, it was not an established power of the Court. Indeed, according to petitioners, with respect to removal of jurists,

---

[5] Like its 1874 predecessor, as amended, the Constitution of 1968 provides for the following means of removing jurists by other branches of government, and for automatic forfeiture of the judicial office. The House of Representatives has the sole power of impeachment: "The Governor and all other civil officers shall be liable to impeachment for any misbehavior in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth." PA. CONST. art. VI, §§ 4, 6 (1968). Moreover, "[a]ll civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate." PA. CONST. art. VI, § 7 (1968). Finally, Article V, Section 18 provides that "A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section shall forfeit automatically his judicial office and thereafter be ineligible for judicial office." PA. CONST. art. V, § 18(d)(3) (1968).

decisions of the Court suggested that the methods for removal expressly included in the Constitution were exclusive and the Supreme Court was absent from the removal process. Board's Brief at 28-29 (citing Burton R. Laub, THE JUDICIARY: REFERENCE MANUAL No. 5, at 158, 167, 169, 195 n.1 (1968); In re Bowman, 74 A. 203, 204 (Pa. 1909) ("constitutional direction as to how a thing is to be done is exclusive and prohibitory of any other mode which the Legislature may deem better or more convenient"); Commonwealth v. Gamble, 62 Pa. 343, 343 (Pa. 1869) ("gift of power to remove a judge by impeachment or address excludes power to remove in any other manner"); and Carpentertown Coal & Coke Co. v. Laird, 61 A.2d 426, 428-29 (Pa. 1948) ("Carpentertown") (describing King's Bench power)); see also Bruno Brief at 22.

Petitioners maintain that, against this background, the Constitutional Convention of 1968 approved the creation of the Judicial Inquiry and Review Board ("JIRB"), whose processes were dominated by this Court: the Court appointed a majority of the members and the Court had ultimate *de novo* authority to decide whether discipline would be imposed and what form that discipline would take. The Convention added Section 18 -- addressing judicial discipline -- and, for the first time, expressly removed disciplinary functions from the Court's administrative and supervisory powers. According to petitioners, the separate functions overlapped, and the disciplinary system was "an adjunct" to the power of the Court to administer and supervise the courts. The Supreme Court maintained disciplinary decisional authority following action and recommendations by the JIRB. Petitioners argue that the Court's power was not "limitless" because the Court could only act upon recommendation of the JIRB rather than commence proceedings independently. Board's Brief at 30-33 (citing In re Subpoena on Jud. Inquiry & Rev. Bd., 517 A.2d 949, 952 (Pa. 1986) ("JIRB Subpoena"); First Amendment Coalition v. Jud. Inquiry & Rev. Bd., 460 A.2d 722, 724

(Pa. 1983); JOURNAL OF THE PA. CONST. CONVENTION, Vol. I, No. 44, at 835 (Feb. 15, 1968)); see also Bruno Brief at 22-26.

Petitioners note that the judicial disciplinary scheme changed in 1993, when the people, acting upon the General Assembly's proposal, amended the Pennsylvania Constitution to eliminate the JIRB in favor of the Board and the CJD. Petitioners offer that the 1993 amendment separated the two functions: this Court retained general administrative and supervisory authority while a new two-tier apparatus was created with exclusive jurisdiction over disciplinary functions. In petitioners' view, the amended Article V, Section 18 limits the general powers of supervision and administration that the Supreme Court has under Article V, Section 10(a). Petitioners argue that the specific enumeration of the powers and authority in the disciplinary sphere of the Board and of the CJD acts as an implicit limitation on any general power of the Court. Petitioners go so far as to claim that the Court's power to discipline in the first instance, as an adjunct of its administrative or supervisory authority, "has been eliminated." Board's Brief at 32-35 (citing PA. CONST. art. V, §§ 10(a), 18; see also Bruno Brief at 26-28, 57-58. Additionally, petitioners assert that this Court's published decisions and orders in disciplinary matters reveal that the Court exercises an "extremely limited" power of review and respects the CJD's exercise of discretion, which implicitly shows that the Court recognizes the CJD's exclusive authority to discipline jurists. Bruno Brief at 39 (citing In re Merlo, 58 A.3d 1, 14-15 (Pa. 2012)).

For petitioners, the salient question in this matter is whether the Supreme Court's intervention by its action against a judicial officer is either supervisory or disciplinary in nature. Petitioners emphasize a perceived dichotomy in the exercise of the Supreme Court's authority: petitioners concede that the Court has plenary power to address supervisory or administrative matters but they insist that the Court lacks any authority to

"discipline" jurists in the first instance. Board's Brief at 41-43 (citing In re Assignment of McFalls, 795 A.2d 367, 373 (Pa. 2002) and In re Assignment of Avellino, 690 A.2d 1138, 1143 & n.6 (Pa. 1997) ("Avellino I"); Bruno Brief at 38-39 (quoting In re Melograne, 812 A.2d 1164, 1167 (Pa. 2002) ("It is beyond cavil that the [CJD] has jurisdiction over the general subject matter presented here, namely, determining whether an individual engaged in judicial misconduct. In fact, that is the tribunal's constitutional *raison d'être*.")); see also In re Assignment of Avellino, 690 A.2d 1145 (Pa. 1997) ("Avellino II").[6] According to petitioners, the drafters of Section 18 believed that supervisory and administrative concerns are separable from disciplinary matters and, as a result, the drafters crafted a patently distinct provision governing discipline. Following the 1993 amendment, petitioners assert, the two-tiered disciplinary system operates independently from the Supreme Court. For example, the Supreme Court's general authority to promulgate rules of procedure does not apply in the disciplinary realm; the Board and the CJD promulgate their own rules of procedure. Board's Brief at 50 (comparing PA. CONST. art. V, § 18(a)(6) (1993) with PA. CONST. art. V, § 18(j) (1968) (repealed)).

Petitioners claim that the Court's decisions in Avellino I and McFalls, supra, are not to the contrary. In Avellino I and McFalls, according to petitioners, the jurists had refused judicial assignments, creating administrative concerns properly addressed by the Court in its supervisory or administrative capacity. Petitioners assert that the

---

[6]     The Avellino I Court held that the Supreme Court had authority at King's Bench to impose sanctions when a judicial officer refused to comply with the assignment to preside over criminal trials in the "felony-waiver program" of the court of common pleas, for the calendar year 1997. In Avellino II, the Court held that a sanction of suspension without pay for three months, followed by submission of performance reports for six months, was warranted under the circumstances.

Avellino I Court recognized the distinction, holding that the Court in that matter was exercising its supervisory power and addressing an affront to its authority, rather than stating that it had the authority to discipline or actually imposing any disciplinary sanction in the first instance. In both Avellino I and McFalls, petitioners assert, the Supreme Court intervened in ongoing disputes and acted quickly on the jurists' disobedience, suggesting administrative or supervisory action. By comparison, petitioners opine, the Court's actions in Bruno (and also in Solomon) are disciplinary in nature and subject to the CJD's exclusive jurisdiction.

Petitioners explain the distinction between disciplinary and administrative action by reference to Judge Solomon's circumstances. See supra n.3. According to petitioners, the Court's decision to issue a rule to show cause upon Judge Solomon suggests disciplinary action because more than a year lapsed between Judge Solomon's alleged failure to cooperate with the Traffic Court investigation and the Court's rule to show cause and, during this time, the FJD did not request any action by the Supreme Court to induce Judge Solomon's cooperation before the rule issued. Petitioners also observe that no other judges who failed to cooperate with the court-ordered review of Traffic Court, e.g., by invoking the right against self-incrimination, were subject to a similar rule to show cause. Petitioners claim that the Supreme Court's targeted action involving the sitting jurist was intended to discipline rather than to assure the functioning of the judicial system. Furthermore, petitioners emphasize that the Supreme Court's action involves a fact-finding investigation into Judge Solomon's past conduct, which they believe takes the case "into the area of asserted misconduct" subject to the CJD's exclusive dominion. Board's Brief at 35-42; see also Bruno Brief at 59-62.

Finally, petitioners suggest policy concerns with the Court's actions. For instance, according to petitioners, an original investigation through a master "has the potential for intruding" upon the Board's constitutional duties to investigate and prosecute judicial misconduct and upon the CJD's constitutional authority to impose discipline. Petitioners claim that any disciplinary action would "arguably preclude" the CJD from imposing a sanction on a Board-filed complaint so as not to subject the jurist to two disciplinary sanctions for the same conduct. Moreover, petitioners remark that a Court inquiry would not be subject to the confidentiality and other due process protections afforded by Article V, Section 18. Bruno Brief at 57-58 (citing JIRB Subpoena, 517 A.2d at 954); see also Board's Brief at 42-44.

As an alternative, petitioners offer that, if the Supreme Court were to hold that it has authority to act in disciplinary actions, the Court should nevertheless refrain from acting and, instead, should refer the sitting judge to the Board.[7] This argument proceeds as follows: an approach of employing a master suffers from practical impediments and fails to ensure a fair process: for example, the parties receive no pre-hearing discovery; there is no predictable procedure or investigation; the charges are not specific; discipline takes place on an *ad hoc* basis; and resulting sanctions may lack parity. In such an instance, the Supreme Court "appear[s] to perform concurrently as the investigator, prosecutor and judge. . . [a] comingling of constitutional functions" that violates due process. Accordingly, a hearing before the master is "unseemly" and "difficult."

Moreover, the Court's involvement at this stage would "undermine any later disciplinary case," as *res judicata* and collateral estoppel would operate. And, if the

---

[7] This particular argument is made in the jurists' joint brief and is not forwarded here by the Board.

CJD were to impose parallel discipline, the Supreme Court would be in the difficult position of appearing to have pre-judged the matter prior to the jurist's appeal of right, should one follow. Referral to the Board for disciplinary action is therefore preferable and would be sufficient to vindicate the Court's supervisory responsibilities and authority. The referral would allow agencies with appropriate resources to investigate and prosecute disciplinary matters. Bruno Brief at 48-62.

With respect to the circumstances specific to the Bruno matter, petitioners rely in part on the supervisory / disciplinary dichotomy already developed, but primarily develop an analysis of Article V, Section 18(d)(2), the constitutional provision which expressly addresses interim suspensions by the CJD.

Petitioners argue that Article V, Section 18(d)(2) vests by its plain language "exclusive" authority in the CJD to direct the interim suspension of a jurist who has been charged with a felony or against whom charges have been filed by the Board with the CJD. In petitioners' view, because the constitutional language refers to the authority of no entity other than the CJD to enter interim suspensions, the intent of the drafters was that only the CJD -- and not the Supreme Court -- would have that power. Petitioners further claim that the Constitution expressly eliminates the Supreme Court from the process entirely by prohibiting appeals of interim suspension orders. See Board's Brief at 46-48, 57; Bruno Brief at 18-19.

Looking beyond the plain language, petitioners remark that the 1993 amendment provided for the first time constitutional authority to order interim suspensions of jurists, and allocated that authority expressly to the CJD, with the intent to remove any residual supervisory and administrative authority vested in the Supreme Court. Petitioners assert that the drafters of the 1993 amendment to Section 18 of Article V must be presumed to have been aware of the state of the law at the time of promulgation,

specifically, that the Court had relied on Article V, Section 10(a) to impose an interim suspension in In re Franciscus, 369 A.2d 1190 (Pa. 1977). Board's Brief at 51-53 (citing PA. CONST. art. V, § 10(a)). Petitioners claim that, by granting the authority to impose interim suspensions to the CJD instead, the drafters of the 1993 amendment must have intended to remove the same authority from the Court. Interpreted together, the argument goes, Sections 10(a) and 18(d)(2) exclude the Supreme Court from disciplinary matters because the CJD's Section 18(d)(2) authority is an express carve-out from and limitation on the general supervisory and administrative powers of this Court articulated in Section 10(a). According to petitioners, the Court's general administrative or supervisory power must yield to the CJD's specific authority in this regard, consistent with the rule of interpretation that "the specific must prevail over the general." Id. at 54; accord Bruno Brief at 33-37.

Petitioners also suggest that the legislative history of the 1993 amendment supports the interpretation that legislators sought a "dramatic" departure from the previous system of disciplining jurists, which had not functioned well, by creating an independent disciplinary system outside the control of the judiciary. See Board's Brief at 55-56 (citing 1992 Pa. Legislative Journal-House 1513, 1516-18, 1523 (June 24, 1992); 1992 Pa. Legislative Journal-Senate 2481, 2482-83 (July 1, 1992); 1993 Pa. Legislative Journal-House 53, 62 (January 27, 1993)). Petitioners add that the citizenry approved the amendment, whose purpose was described in the referendum ballot question as "establish[ing] a new system for disciplining Pennsylvania justices, judges, and justices of the peace (now known as district judges)." Id. at 57 (quoting Pa. Bull. Vol. 23, No. 8, at 816 (Feb. 20, 1993)). According to petitioners, the 1993 amendment was intended to eliminate judicial domination of the disciplinary system and to "strip" the Supreme Court of the power to impose discipline. Petitioners conclude that, as a result

of the 1993 amendment, "[w]hatever authority this Court had exercised in those [interim] circumstances ha[s] been transferred to the CJD." The 1993 amendment "essentially removed this Court from participation in the system until an appeal from a final order from the CJD." Id.; accord Bruno Brief at 26-28.[8]

Judge Bruno subscribes to the same interpretation of Section 18(d)(2) of Article V as the Board but adds, in the alternative, the argument that the Supreme Court may have the supervisory authority to suspend a jurist on a temporary interim basis, if the CJD does not act timely. According to Judge Bruno, once the Court orders an interim suspension, "the matter should be immediately transferred to the [CJD] for the [CJD] to make the final decision and to have a hearing on the issue of the interim suspension." After that, Judge Bruno asserts, the Pennsylvania Supreme Court would no longer have any authority because an interim suspension order is not appealable. Judge Bruno posits that this "compromise" solution would resolve any problems, including that the Court is not in the position to provide a timely hearing post-deprivation after ordering an interim suspension. Bruno Brief at 34, 36-37, 40-41.

---

[8] Judge Bruno alleges that the 1993 amendment was a reaction of "the public" and the General Assembly to the conduct of Supreme Court Justices in the discipline of former Justice Rolf Larsen. Bruno Brief at 24-28 (citing Matter of Larsen, 616 A.2d 529 (Pa. 1992)). The AOPC notes that counsel's conjecture that Section 18 was a response to disputes among members of the Supreme Court is not "legislative history" as that term is generally understood. The AOPC also rejects the Board's choices of legislative history, stating that the Board misapprehends the record. For example, the comments of Representative Piccola cited by Judge Bruno were made in the context of a rejected amendment and do not reflect the language of Section 18 as proposed to the people.

In light of our disposition, we find it unnecessary to resolve disputes regarding the alleged background or the legislative history of the 1993 amendment to Article V, Section 18.

**2.**

With regard to the second issue upon which we received briefing, petitioners assert that the CJD's jurisdiction is exclusive. Petitioners reject the notion of concurrent jurisdiction over "disciplinary" matters, pursuant to which both this Court and the CJD would have authority to issue orders of suspension. According to petitioners, the language of Article V, Section 18 is plain that the CJD has exclusive jurisdiction to discipline jurists for alleged wrongdoing and to issue interim suspensions pending resolution of a complaint by the Board or outcome of felony charges.

Petitioners assert that, although this Court has acted to issue interim suspensions in the past, the decisions upon which the Court relied, *e.g.*, Franciscus, Avellino I, and McFalls, do not support the exercise of the Court's authority here. Petitioners note that Franciscus pre-dates the 1993 amendment of Article V, Section 18, which changed the constitutional paradigm. Furthermore, petitioners remark that the authority the Franciscus Court relied upon to impose interim suspensions was the Court's supervisory power, rather than a broader King's Bench power. "If ever [King's Bench authority] was a separate source of this Court's power to issue interim suspensions, it no longer is," according to the Board. Board's Brief at 59-60 (citing Franciscus, 369 A.2d at 1192); see also Bruno Brief at 37-39.

Petitioners distinguish Avellino I and McFalls as "judicial assignment" and not "judicial misconduct" cases because those cases involved administrative circumstances, in which jurists refused to take the bench. The Court did not enter interim suspensions or endeavor "to head off public disesteem for the judicial system likely to develop when a judge charged with crimes continues to 'hold court'" pending resolution of criminal charges, as is the case with Judge Bruno. Petitioners also note that there was no exigency for the Court to act in Avellino I and McFalls, which is why the Court's action in

those matters was administrative and, therefore, proper. Board's Brief at 58-59 (quoting Bruno, 69 A.3d at 805 (Clement, J., concurring)). By comparison, petitioners opine that the Court should have refrained from acting in recent "disciplinary" matters, such as Bruno, In re Joyce, No. 394 Jud. Admin. Docket 1 (Pa. Aug. 21, 2007) (*per curiam)*; In re Merlo, No. 361 Jud. Admin. Docket (Pa. Dec. 22, 2010) (*per curiam)*; In re Melvin, No. 384 Jud. Admin. Docket (Pa. May 18, 2012) (*per curiam)*; In re Mulgrew, No. 388 Jud. Admin. Docket (Pa. Sept. 19, 2012) (*per curiam)*; In re Nocella, No. 391 Jud. Admin. Docket (Pa. Nov. 9, 2012) (*per curiam)*; In re Lowry, No. 397 Jud. Admin. Docket (Pa. Feb. 1, 2013) (*per curiam)*; and In re Sullivan, No. 398 Jud. Admin. Docket (Pa. Feb. 1, 2013) (*per curiam)*. Id. at 58-59 & n.23.[9]

Judge Bruno adds to the constitutional analysis the practical concern that concurrent jurisdiction creates a conundrum for the AOPC regarding which order to obey where, as here, orders of the CJD and of the Supreme Court are at odds.


**3.**

In light of its conclusion that the CJD's jurisdiction to enter interim suspension orders is exclusive, petitioners state that the last question we ordered to be briefed, concerning the hierarchy of orders if both the CJD and this Court act, need not be reached.

According to petitioners, this Court is not authorized to act, even where the CJD fails to act, because any action is within the CJD's exclusive discretion. Thus, the

---

[9] The Board distinguishes the matter of In re Singletary, No. 377 Jud. Admin. Docket (Pa. Jan. 5, 2012) (*per curiam)*, on the ground that the interim suspension followed an administrative decision, which ultimately resulted in removal by the CJD. According to the Board, this Court had jurisdiction under such circumstances, for which Article V, Section 18(d)(2) of the Constitution does not provide.

Board declares that, "[a] failure to order a suspension does not allow th[e Supreme] Court to do as it pleases if it disagrees with the action or inaction of the CJD in failing to order a suspension." Petitioners also offer that this Court has "already answered the question" of which order takes precedence by vacating its order imposing a suspension without pay and "essentially enforc[ing] the CJD's [o]rder." See In Re: Bruno, 71 A.3d 249 (Pa. 2013) (*per curiam*). According to petitioners, competing orders force parties to litigate in two fora "unnecessarily and inappropriately." Petitioners characterize "such dual jurisdiction" as absurd and "to be avoided in constitutional construction." Petitioners seek resolution of the first two issues in accord with their positions "so that the third never occurs again." Board's Brief at 61-62; accord Bruno Brief at 46-47.

Judge Bruno adds that the conflict between orders of the Court and of the CJD, as well as the inconsistent adherence by the AOPC to directions regarding pay, affect the public's perception regarding the integrity and fairness of the judicial system. Judge Bruno contrasts his own situation (this Court ordered suspension without pay, the CJD ordered suspension with pay, and the AOPC withheld pay until further order of this Court) with the circumstances of former Justice Joan Orie Melvin and Judge Thomas M. Nocella, who were suspended with pay by this Court and without pay by the CJD, and the AOPC again withheld pay premised upon the CJD's order. The "situation should never be reached," and will not be reached, Judge Bruno argues, if this Court refrains from entering interim suspension orders. Bruno Brief at 44-46.[10]

---

[10]  *Amicus curiae* SCJAP filed a brief in which it purports to undertake an Edmunds analysis of Article V, Sections 10 and 18. SCJAP essentially replicates petitioners' arguments with respect to the plain language and legislative history of the provisions. In addition, SCJAP argues that the Supreme Court may not exercise extraordinary jurisdiction in a disciplinary matter because "the CJD is not a component part of the [U]nified [J]udicial [S]ystem" but "a constitutional agency independent in its own right." SCJAP Brief at 26-27 (citing PA. CONST. art. V, § 1, 42 Pa.C.S. §§ 301, 1701).

## B. Arguments of the AOPC and the PBA

### 1.

The AOPC responds that the Supreme Court may exercise King's Bench jurisdiction to issue an order of interim suspension in a situation such as that involving Judge Bruno. According to the AOPC, the Court's authority is broad and includes superintendency over inferior tribunals and their members. The breadth of authority fits the Court's responsibility to safeguard the integrity of the Unified Judicial System, against judicial impropriety and even against the appearance of judicial impropriety. The AOPC argues that the 1993 amendment, while creating the Board and the CJD, did not divest the Supreme Court of its powers of superintendency over Pennsylvania courts and its judicial officers. AOPC Brief at 11-13 (quoting Carpentertown, 61 A.2d at 428-29). The PBA offers additional helpful perspective and detail regarding the Court's King's Bench jurisdiction.

King's Bench power, the PBA states, was vested in this Court by the Act of May 22, 1722, and has survived enactments and revisions of the Pennsylvania Constitution. PBA Brief at 3-4 (citing PA. CONST. SCHED. art. V, § 1; 42 Pa.C.S. § 502; Carpentertown, 61 A.2d at 429). Today, the Pennsylvania Constitution provides that the Court has "such jurisdiction as shall be provided by law." Id. (citing PA. CONST. art. V, § 2). Aspects of the Court's King's Bench authority are recited in the Constitution, at Sections 2 and 10 of Article V; these provisions address the Supreme Court as the "supreme judicial power" and as the "general supervisory and administrative authority." Moreover, Section 502 of the Judicial Code explicitly codifies that the authority of the Court of King's Bench has continued in the Supreme Court since 1722. Id. (citing 42 Pa.C.S. § 502). The PBA notes that the Court has called upon the King's Bench authority in

cases similar to those of Judge Bruno and Judge Solomon.  Id. at 5-7 (citing Franciscus; Avellino I; Merlo, supra).

The AOPC and the PBA emphasize that the 1993 amendment left Sections 2 and 10 of Article V intact.  As the AOPC explains, the 1993 amendment did not "affect, restrict, or suspend *sub silentio*" the King's Bench powers of the Court but simply "altered" the mechanism for investigating and adjudicating charges of judicial misconduct.  The PBA notes that Article V, Section 18 simply delineates the CJD's authority within the disciplinary process and does not purport to limit the Court's authority to supervise the court system, which is a separate matter.  PBA Brief at 7-9 (citing In re Merlo, 17 A.3d 869, 871 (Pa. 2011)); accord AOPC Brief at 25 ("[T]here is nothing 'inherently inconsistent' between the existence of the supervisory and administrative authority of the Supreme Court and the disciplinary authority of the [Board] and the CJD.").  The PBA offers that the CJD is an inferior tribunal that is part of the Unified Judicial System and, as a result, is under this Court's supervisory authority. PBA Brief at 7-9 (citing PA. CONST. art. V, § 1); see also AOPC Brief at 29-30 (citing PA. CONST. art. V, § 18(c)(1)-(3) (right to appeal CJD decision to Supreme Court)). Accordingly, the PBA rejects the predicate dichotomy perceived by petitioners between the authority of the Court to act upon conduct resulting in disciplinary action and supervisory intervention.  PBA Brief at 10-11 (quoting Merlo, 17 A.3d at 871).

The PBA submits that Sections 2 and 10 of Article V must be given effect alongside the 1993 amendment "because the Constitution is an integrated whole."  To give full effect to the Supreme Court's constitutional supervisory power and its designation as the "supreme judicial power of the Commonwealth" means that the Court has jurisdiction to act under circumstances such as those involving Judge Bruno. Indeed, the AOPC and the PBA note that the Court has already exercised its

supervisory authority in similar circumstances since the 1993 amendment. AOPC Brief at 14-16 (citing Avellino I, 690 A.2d at 1143; Office of Disciplinary Counsel v. Jepsen, 787 A.2d 420, 425 (Pa. 2002)); PBA Brief at 11.

The PBA adds that the Court "may undertake its own investigation of matters implicating the proper functioning of the judiciary. This is implicit . . . in this Court's power to exercise its supervisory authority even in the absence of any related proceeding before a lower court . . . [and] a necessary feature of this Court's King's Bench power." PBA Brief at 14 (citing Avellino I, 690 A.2d at 1140 and Carpentertown, 61 A.2d at 429); accord AOPC Brief at 29-30 (citing Friedman v. Corbett, 72 A.3d 255, 256 (Pa. 2013)). The AOPC adds that "[t]he Solomon matter is solidly within the administrative authority of this Court" and is akin to an internal labor dispute or an employment hearing, like the disputes in Avellino I and McFalls.

The PBA and the AOPC also dismiss petitioners' policy concerns. Thus, the PBA argues that the exercise of supervisory power by the Supreme Court does not affect the separate authority of the Board to investigate a jurist's same conduct pursuant to Article V, Section 18 of the Pennsylvania Constitution. PBA Brief at 16-17 (quoting McFalls, 795 A.2d at 373) & 36-37. Moreover, the AOPC notes that the Board's investigation of jurists is confidential and the Court becomes aware that the CJD is acting only if the jurist waives confidentiality. As a result, the AOPC argues, there is uncertainty whether the Board and the CJD is acting and, accordingly, timely Supreme Court action is generally appropriate. AOPC Brief at 42-44.

Furthermore, the hearing before a Court's master, the AOPC states, comports with due process requirements. The AOPC extends the labor and employment analogy to suggest that a similar standard of due process is required here: notice and an opportunity to be heard; an opportunity to obtain discovery is not required. Id. at 44

(citing <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 546 (1985)). Furthermore, the AOPC suggests that the Court need not guarantee confidentiality of the proceedings before a master because, in a case implicating the Court's supervisory authority, the public requires transparency. The PBA adds that "the requirements of due process are flexible" and "this Court may fashion appropriate procedures in carrying out its broad supervisory powers." Indeed, the PBA notes, this Court has already rejected the notion that its administrative and supervisory authority should be exercised by any particular mechanism prescribed by general rule, or that any right to discovery or a jury trial exists. PBA Brief at 14-15 (quoting <u>Avellino I</u>, 690 A.2d at 1140 n.1 & 1142 n.3).

The AOPC concludes that the Supreme Court is required to act in cases such as <u>Solomon,</u> "and properly did so within the Court's inherent supervisory authority." King's Bench authority serves in this context "to protect and promote the public confidence in the judicial system, to maintain a high standard of professional ethics and propriety, and to guard and protect the dignity and authority of the [C]ourt, and the safety and protection of the public." AOPC Brief at 16, 33-34 (internal quotations omitted) (quoting <u>Franciscus</u>, 369 A.2d at 1194-95). While the Court has in the past referred jurists to the Board for investigation, the AOPC notes, such an action is not required in every case; "the Supreme Court must retain its constitutional supervisory discretion to act as the supervisory power over the Unified Judicial System as necessary, and on a case by case basis." <u>Id.</u> at 45-46. The PBA agrees: the Court may elect to defer to the Board for investigation where appropriate, but it is not constitutionally required to do so. PBA Brief at 15 (citing <u>Avellino I</u>, 690 A.2d at 1143 n.6).

In Judge Bruno's case, the AOPC disputes petitioners' reading of Article V, Section 18(d)(2). According to the AOPC, the two provisions of the Constitution at issue here, Sections 10(a) and 18(d)(2) of Article V, are not in conflict and the Court should

interpret them to give effect to both. The AOPC claims that Article V, Section 10(a) vests general, broad supervisory and administrative power in the Supreme Court, while Article V, Section 18(d)(2) is restricted by its express terms to disciplinary actions brought within the framework of Section 18. These separate powers available for addressing the same, or similar, circumstance do not create an inherent inconsistency, even though the result may be asymmetric. AOPC Brief at 25 (citing Mohamed v. Dep't of Transp., 40 A.3d 1186, 1193 (Pa. 2012) (quoting Pa. Turnpike Comm'n v. Sanders & Thomas, Inc., 336 A.2d 609, 614 (Pa. 1975)).

The language of Section 18(d)(2), the AOPC states, is plain: the CJD is authorized to enter interim suspension orders and the provision simply does not address whether the Supreme Court may do so as well. The AOPC notes that the word "exclusive," which the Board and Judge Bruno read into the provision as a necessary buttress for their argument, is absent from Section 18(d). The AOPC also argues that, in light of this plain language, the premise that the CJD's jurisdiction became exclusive following the 1993 amendment cannot be implied. Section 18(d)(2) did not repeal by implication Section 10(a) because the provisions are neither irreconcilable nor does Section 18(d)(2) cover the whole subject of Section 10(a) so as to invite an interpretation that it was clearly intended as a substitute for, or as an implied repeal of, the earlier provision. In the AOPC's view, this Court's prior decisions confirm this interpretation. AOPC Brief at 22-25, 27 (citing In Re: Jud. Conduct Bd. Subpoena No. 96076, 703 A.2d 461, 463 (Pa. 1997) ("JCB Subpoena"); Jepsen; Avellino I; Franciscus, supra).

The PBA adds that interim suspension orders are entered by the Court in its supervisory function, to assure the integrity of the judicial system rather than being "meted out as a form of punishment." PBA Brief at 10 (citing Franciscus, 369 A.2d at

1195).  The PBA notes that the Court acts upon the threat to the smooth functioning of the system posed, for example, by the pendency of misconduct charges.  No final decision is made related to the charges because an interim suspension is not the result of investigation or adjudication of misconduct charges.  Id. (quoting Merlo, 17 A.3d at 871).  Indeed, the PBA suggests that the same conduct that gives rise to the Court's administrative / supervisory action may also result in disciplinary sanctions.  The Court's action of interim suspension, according to the PBA, does not affect the Board's independent authority to investigate the same conduct and, in fact, the Court has referred suspended jurists to the Board.  Id. at 11-12 (citing McFalls; Merlo, supra).  The PBA notes that the judicial conduct at issue here threatens the public's perception of the judiciary and justifies administrative action, regardless of whether the allegations are ultimately pursued or proven via the Article V, § 18 process.

Similarly, the AOPC notes that the Court's authority to issue interim suspensions is not limited to instances in which a jurist "directly defies authority" within the judicial system.  "The fact that some prior cases involved that circumstance does not serve to cabin [the Court's] supervisory authority."  Indeed, the AOPC explains, the Court has suspended jurists for other reasons, such as when the jurist was indicted for crimes stemming from a fraudulent insurance claim.  AOPC Brief at 16 (quoting Merlo, 17 A.3d at 871-72 and citing, *e.g.*, In re Joyce, No. 301 Jud. Admin. Docket 1 (Pa. Aug. 17, 2007)).


## 2.

On the second issue, the AOPC and the PBA agree that the Court and the CJD have concurrent jurisdiction.  The PBA reiterates that the 1993 amendment did not

revoke or diminish the Supreme Court's supervisory powers, pursuant to which the Court may enter interim suspension orders. PBA Brief at 16.

Moreover, the PBA rejects the suggestion that the non-final and not-appealable-of-right nature of CJD interim suspension orders has any bearing on the question of the Court's authority to act. According to the PBA, a non-final order does not prevent review. The Court's exercise of supervisory powers, the PBA argues, "is not confined to appellate review of lower court orders"; the Court may intervene and order an interim suspension, independent of the CJD. Id. at 19 (citing, e.g., Pa.R.A.P. 311 (interlocutory orders appealable of right); Pa.R.A.P. 312 (interlocutory appeals by permission); Pa.R.A.P. 313 (collateral order doctrine)); accord AOPC Brief at 38-39 (comparing PA. CONST. art. V, § 18(d)(2) with Pa.R.A.P. 341) (prohibition against taking appeal from interim suspension order is similar to general rule governing appeal from other interlocutory order and does not alter relationship between CJD and Supreme Court). The PBA states that an order from this Court issuing an interim suspension "is outside the ambit of Section 18(d)(2)'s restriction on appellate jurisdiction over orders entered by the CJD." "A contrary position" impairs the Court's ability to perform its constitutionally-mandated duties. Id. at 18-19.

Finally, the PBA rejects the notion that, in issuing interim suspension orders, this Court is pre-judging the merits of a CJD disciplinary action, even when the disciplinary matter is premised upon the same conduct. The PBA notes that this Court may enter interim suspension orders simply upon reviewing the nature of the charges and the Court's assessment of their impact upon the public perception of the judiciary, rather than based upon any investigation or adjudication of the pending charges. PBA Brief at 20 (citing Merlo, 17 A.3d at 872); see also AOPC Brief at 36-37. This limited approach does not entail addressing the legal or factual merits of the underlying charges, which

may be problematic. The PBA notes that the CJD has taken the approach of examining not only the nature of the charges, but also what the CJD deems to be the merits of the charges in deciding whether to issue interim suspensions. The PBA suggests that this approach "risks an inappropriate collateral attack on the validity of th[e criminal] charges" and potentially embarrassing conflicts with the criminal court adjudicating the charges. PBA Brief at 21.

The AOPC adds that concurrent jurisdiction is in accord with precedent, as explained in Franciscus, Avellino, and McFalls. Melograne, according to the AOPC, is not to the contrary. In Melograne, the question before the Court was whether the CJD had jurisdiction to discipline a jurist who was no longer on the bench during the pendency of the disciplinary action. The Melograne decision simply did not address whether the CJD's jurisdiction was "exclusive," as petitioners claim, and the case is, therefore, inapposite. AOPC Brief at 18 (citing 812 A.2d at 1167 n.2). The AOPC adds that the CJD has jurisdiction to act only after the Board determines that probable cause exists for discipline and files charges; but, the Supreme Court's broader powers take into consideration the Court's responsibilities to the judicial system and the necessity for immediate action in some circumstances. Id. at 19 (quoting Franciscus, 369 A.2d at 1193-94).[11]

---

[11] The PBA also offers five recommendations intended to avoid future jurisdictional conflicts that it views as "counterproductive to a central purpose of the judicial discipline system," i.e., "to promote public confidence in the integrity of the judiciary." See PBA Brief at 22-25. The recommendations are:

    1.    That the Supreme Court should allow the CJD to make interim suspension decisions in the first instance following a complaint and motion of the Board.
    2.    That, if the circumstances require the Supreme Court to enter an interim suspension order, the Court should specify whether the CJD may
(continued…)

**3.**

With regard to this last issue, the PBA states that the 1993 amendment "did not elevate" the CJD's authority over that of the Supreme Court. The Supreme Court, according to the PBA, retains its supervisory power over inferior tribunals, including the CJD. Moreover, the PBA argues that the Court need not decline to exercise jurisdiction here out of deference to the CJD, an argument already rejected in prior cases. PBA Brief at 17 (quoting Franciscus, 369 A.2d at 1194). And, because the Court is the "supreme judicial power in the Commonwealth," the PBA suggests that CJD orders are necessarily subordinate to and may not conflict with the Supreme Court's directives, unless the Court's order expressly allows for subsequent adjudication by the CJD.

Similarly, the AOPC argues that the Supreme Court is the highest court of the Commonwealth, vested with "supreme" judicial power; the Court's orders may not be modified, altered, amended, set aside, or disturbed by an inferior court, such as the CJD. The CJD, according to the AOPC, is a court inferior to the Supreme Court

---

(…continued)

act; absent specification, the CJD should not be permitted to enter an inconsistent order.

3. A judicial officer who is the subject of an interim suspension order by the Supreme Court may apply to the Court to vacate or modify the suspension order.

4. The CJD should establish a "fast track" mechanism for addressing interim suspension requests.

5. The Supreme Court should define the scope of the inquiry for the CJD when reviewing a request for an interim suspension order. *Inter alia*, the CJD's inquiry should be confined to the nature of the charge and its effect on the public perception of the judiciary.

We appreciate the PBA's thoughtful input and, in many respects, our judgment is guided by these recommendations.

because the Supreme Court retains the ultimate power to review on appeal the CJD's decisions. The AOPC states that, while both the Supreme Court and the CJD are capable of determining appropriate discipline, the Court is the final arbiter of the sanction. AOPC Brief at 37-38 (quoting Jepsen, 787 A.2d at 423). The AOPC asserts that the Supreme Court may invoke either its extraordinary jurisdiction, to intervene in an ongoing matter, or its King's Bench jurisdiction, where no matter is pending before the CJD, to enter interim orders of suspension. When exercising these forms of jurisdiction, the AOPC argues, the decision of the Supreme Court is "preeminent." AOPC Brief at 40-42.

### III. The Opinion of the Court of Judicial Discipline

As noted, on May 24, 2013, the CJD issued an order of interim suspension with pay in the Bruno matter. The CJD's opinion in support of the order, as well as the concurring opinion, touched upon the constitutional issues which we address in our Opinion. Indeed, petitioners expressly rely upon a concurring expression in Bruno in fashioning their argument to this Court. The CJD reasoned as follows.

Initially, the CJD held that the crimes with which Judge Bruno was charged -- one count of mail fraud, one count of wire fraud, and one count of conspiracy to commit wire and mail fraud, 18 U.S.C. §§ 1341, 1343, 1349, respectively -- relate to his everyday duties as a judicial officer and thus his continued presence on the bench pending resolution of these charges would have "a possible negative impact on the administration of justice and could possibly harm the public confidence in the judiciary." In re Bruno, 69 A.3d 780, 782 (Pa. Ct. Jud. Disc. 2013). The CJD then held that suspension with pay was appropriate.

As relevant here, the CJD recognized that its order was in tension with this Court's February 2013 Order. The CJD considered whether the February 2013 Order barred the CJD's action on the Board's petition; it rejected the notion for three reasons. First, the CJD said that it issued its order based upon a developed record not available to the Supreme Court at the time that the February 2013 Order issued. Second, the CJD indicated its agreement with the CJD concurring opinion that Section 18(d)(2) of Article V "plainly confer[s] authority to issue orders of interim suspension on th[e CJD]," including under the circumstances of Judge Bruno's case. The CJD concluded that the Supreme Court recognized the authority of the CJD to issue interim orders of suspension in cases in which the Court had already acted, and that the CJD's order would control regardless of whether it conflicted with the initial order of the Supreme Court. Id. at 798-99.

The concurring opinion represented the views of three members of the CJD who also joined the majority opinion. The concurrence specifically addressed the CJD's decision to suspend Judge Bruno with pay while this Court's Order to suspend Judge Bruno without pay was in force. The concurrence opined that the CJD's authority to issue interim suspensions is exclusive. According to the concurrence, following the 1993 amendment of the Pennsylvania Constitution, the Supreme Court was "wrong" to rely on the decision in Franciscus, which interpreted Section 18 as added in 1968, to impose interim suspensions. In the view of the concurrence, the 1968 provision differed in quality from the 1993 amendment because the latter "greatly diminish[ed] the Supreme Court's supervisory powers." Id. at 802 (Clement, J., concurring, joined by Cellucci and Mullen, JJ.) (emphasis omitted). The concurrence recounted that, under the 1968 version of Section 18, the Court had authority to impose discipline *de novo*, while the JIRB had no such authority at all, including to enter interim suspensions. The

concurrence argued that the 1993 amendment "seriously circumscribed" the Supreme Court's review of disciplinary matters decided by the CJD and expressly transferred the power to enter interim suspensions to the CJD. "[I]t is quite reasonable to regard Section 18(d)(2) as an **express** transfer of responsibility for interim suspensions to [the CJD] because [the provision] contains an **express** diminishment in the Supreme Court's supervisory powers by **expressly** providing that the Supreme Court has **no authority** to review orders of [the CJD] imposing interim suspensions." Id. (emphasis in original). The concurrence concluded by opining that the drafters of Section 18(d)(2) "specific[ally] and emphatic[ally]" intended the CJD to have exclusive jurisdiction over interim suspensions, an intent that the Court's opinions since the 1993 amendment have nullified. Id. at 802-03 (citing Avellino I, supra).

Moreover, the concurrence argued that there was a conflict between Sections 10(a) and 18(d)(2) of Article V, which, the concurrence believed, requires resolution in accordance with the legislative rules of statutory construction. According to the concurrence, "it is beyond argument" that the people of the Commonwealth, in delegating a power to enter interim suspension orders to the CJD -- orders which may not be directly appealed as of right -- "intended that those orders were not to be overridden and that the [CJD] should be free from interference in performing its duty so assigned." The concurrence maintained that when the Supreme Court enters interim suspension orders, whether in accord or in conflict with a CJD order in the same matter, Section 18(d)(2) is rendered meaningless. To resolve the conflict, the concurrence stated, Section 18 should be interpreted as the specific provision which controls the inquiry over and above Section 10, the general provision that grants the Supreme Court authority over administrative matters -- just as a statute would be interpreted under the precept governing general and specific provisions. According to the concurrence, the

Court's powers under Section 10 do not include "matters of suspension, removal, discipline and other sanctions" because these are addressed by Section 18. The Supreme Court's power under Section 10, the concurrence opined, is restricted to assignment of judges. The title of Section 10 is "Judicial Administration" which, according to the concurrence, implies that discipline is not among the considerations of the provision.

The concurrence further argued that the decisions in Avellino I and McFalls supported its interpretation, insofar as both cases implicated the assignment of jurists rather than discipline. The concurrence also noted that the actions of the Court in Avellino I and McFalls were not "interim" suspensions but temporary suspensions without pay for refusal to take the bench. These scenarios, according to the concurrence, are distinguishable from the circumstances in Franciscus, where the Court entered an interim suspension so as to protect the integrity of the judiciary. The concurrence dismissed the decisions in Avellino I and McFalls as "not hav[ing] the precedential credentials ascribed to them by the Supreme Court" when they were cited to support interim suspension orders by the Court in post-1993 amendment cases.

The concurrence also challenged the Supreme Court's authority to enter interim suspension orders pursuant to the Court's King's Bench powers. Thus, the concurrence quoted this Court's decision in Carpentertown and concluded that the King's Bench power of superintendence is over lower courts and tribunals, but does not encompass "the behavior of lower court judges." Id. at 806. In a footnote, the concurrence noted that "the superintendence of the latter [lower court judges] is conferred separately" in Section 18, to the Board and the CJD. Id. at 806 n.13.

The concurrence next quoted a report on the state of the law provided to the 1968 Constitutional Convention to support its conclusion that, while the Supreme Court

may have had authority under King's Bench and as part of its general supervisory powers to "remove or discipline lower court judges," the power had not been exercised historically and, in fact, may have been rendered meaningless because the Supreme Court had held that "the express constitutional procedures for removing judges, *i.e.*, impeachment, address, and conviction of a crime, are exclusive." Id. at 807 (citing Laub at 168-69). Under these circumstances, the Convention created the JIRB which, according to the concurrence, was ill-equipped to address the emergent circumstances in Franciscus. As a result, the Court acted because, in the concurrence's opinion: "it does not 'look good' for a judge so charged [with crimes relating to his official duties as a justice of the peace] to be 'judging others,' at least until he should be exonerated. For a fact the public is apt to be scandalized, and any confidence it may have had in the integrity of the judicial system is jeopardized so long as that state of affairs continues." Id. The concurrence also felt that the JIRB's authority was inadequate to address the exigencies of the matter.

But, the concurrence argued, the CJD is equipped to prevent any delay in entering an interim order; and thus, the Supreme Court's intervention is no longer necessary. Accordingly, the concurrence concluded that, even if the Court were to decide that the authority of Section 10(a) or of the King's Bench power is a basis upon which to enter interim suspension orders, such action is not appropriate in light of the 1993 amendment to Section 18 of the Pennsylvania Constitution. Id. at 808-09.

In our analysis below, we will discuss the observations of the CJD majority and concurrence when these themes are made relevant by petitioners' own arguments, and also where relevant to our explication of the relative roles and powers of the CJD and this Court.

**IV.    The Power of the Supreme Court Vis-à-vis the Court of Judicial Discipline**[12]

We granted oral argument to address challenges to the jurisdiction of the Court. Although couched as jurisdictional, the parties' arguments touch upon the separate notions of "jurisdiction" and "power" of the Court, as evident from the parties' interchangeable use of the terms.  The principles at work are distinct, however: jurisdiction "relates solely to the competency of the particular court or administrative body to determine controversies of the general class to which the case then presented for its consideration belongs."  Conversely, the power or, more aptly, the authority of the Court is its capacity "to order or effect a certain result."  Vine v. Commonwealth, 9 A.3d 1150, 1165 (Pa. 2010); accord PA. CONST. SCHED. art. V, § 1 ("Supreme Court shall exercise all the powers and, until otherwise provided by law, jurisdiction now vested in the present Supreme Court"); PA. CONST. art. V, § 2(a) (addressing Supreme Court's power) & § 2(c) (addressing Supreme Court's jurisdiction); 42 Pa.C.S. § 502 (addressing Supreme Court's general powers) & §§ 721-726 (addressing Supreme Court's jurisdiction).  Insofar as the subject matter jurisdiction of the Supreme Court is

---

[12]    We preface our discussion by acknowledging the undercurrent of criticism, leveled at our prior decisions by petitioners and the CJD, premised upon the notion that the Court is in the position of passing upon its authority to act.  The situation is not as remarkable as the criticism would suggest: courts resolve routinely questions implicating their jurisdiction and their authority to act in cases.  See, e.g., Commonwealth v. Morales, 80 A.3d 1177 (Pa. 2013) (per curiam); Mercury Trucking, Inc. v. Pennsylvania Pub. Util. Comm'n, 55 A.3d 1056, 1066-67 (Pa. 2012); Board of Revision of Taxes v. City of Philadelphia, 4 A.3d 610, 620 (Pa. 2010); Vine v. Commonwealth, 9 A.3d 1150, 1165-66 (Pa. 2010).  Any degree of discomfort that might be present if members of the Court had a personal interest in the ruling is absent where the interest at issue is vested in the Supreme Court itself and is, therefore, institutional -- as here.  Cf. Driscoll v. Corbett, 69 A.3d 197, 207 (Pa. 2013).  And, as an institution, the Court is not arrogating new powers for itself but is explaining its existing ones.  Accordingly, we proceed to address the merits of petitioners' claims.

concerned, the presentations dispute whether the Court is competent to decide matters implicating the suspension of jurists for disciplinary or other reasons. Regarding the Court's power, the presentations disagree on whether the Court has the authority to commence an investigation into the conduct of a jurist, and to order the interim or temporary suspension of a jurist.

All Pennsylvania courts derive power or authority, and the attendant jurisdiction over the subject matter, from the Constitution and laws of the Commonwealth. PA. CONST. art. V, § 2; 42 Pa.C.S. § 502; see Mercury Trucking, Inc. v. Pennsylvania Pub. Util. Comm'n, 55 A.3d 1056, 1067 (Pa. 2012) (quoting In re Administrative Order No. 1–MD–2003, Appeal of Troutman, 936 A.2d 1, 5 (Pa. 2007)); Housing Auth. of County of Chester v. Pa. State Civil Serv. Comm'n, 730 A.2d 935, 941 & n.13 (Pa. 1999). Our decision implicates the interpretation and application of the Pennsylvania Constitution of 1968, as amended, and of the Judicial Code. Accordingly, the inquiry is subject to *de novo* and plenary review. Commonwealth v. Cromwell Twp., 32 A.3d 639, 646 (Pa. 2011).

As an interpretive matter, the polestar of constitutional analysis undertaken by the Court must be the plain language of the constitutional provisions at issue. A constitutional provision requires unstrained analysis, "a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." Jubelirer v. Rendell, 953 A.2d 514, 528 (Pa. 2008); Commonwealth ex rel. Paulinski v. Isaac, 397 A.2d 760, 766 (Pa. 1979). Stated otherwise, the constitutional language controls and "must be interpreted in its popular sense, as understood by the people when they voted on its adoption." Stilp v. Commonwealth, 905 A.2d 918, 939 (Pa. 2006); Ieropoli v. AC&S Corp., 842 A.2d 919, 925 (Pa. 2004).

In this case, petitioners in particular have adverted to statutory construction principles in advocating their view regarding what was intended by the 1993 amendment. We acknowledge that the canons of constitutional construction reflected in decisional law often employ the familiar language of statutory construction rules to elucidate ambiguous language, including the notion that a specific provision would prevail over a general principle found elsewhere in the charter. And, while acknowledging that the Court will not delimit the meaning of the plain constitutional words by reference to a supposed intent, we have also referred to statements of the drafters of constitutional provisions to confirm a particular interpretation of the plain language of the Constitution. Finally, when necessary to our explicatory analysis of the plain language, we have addressed decisional law and policy considerations argued by the parties that may have been insightful and persuasive. Indeed, reference to interpretive rules is at times appropriate and helpful. See, e.g., Walsh v. Tate, 282 A.2d 284 (Pa. 1971) ("[W]here a conflict exists between a specific constitutional provision, which is unquestionably applicable to a particular case, and certain general provisions, which, were it not for such conflict, might apply, the specific provision will prevail."); see also Jubelirer, 953 A.2d at 528 (same). See, e.g., Robinson Twp. v. Commonwealth, 83 A.3d 901, 952-53 (Pa. 2013) (Opinion Announcing Judgment of Court) (referencing statement of drafter accepted into House Legislative Journal and explicatory questions and answers provided voters in advance of referendum upon amendment at issue); id. at 944 (citing Jubelirer, 953 A.2d at 525 n.12 and Edmunds, 586 A.2d at 895 (addressing decisional law and policy considerations argued by parties)).[13]

---

[13] This approach finds support in academic commentary concerning how state constitutional interpretation is to be undertaken. Recently, we referenced one such scholarly article penned by our colleague Mr. Justice Saylor, who noted that: "there is some degree of consensus [among courts interpreting state constitutions] that the (continued…)

But, reliance on interpretive rules derived from statutory construction concepts is tempered by robust countervailing limitations particular to the constitutional arena. Notable among these limitations -- and particularly relevant here -- is the recognition that "the Constitution is an integrated whole" and, as a result, the Court must strive in its interpretation to give concomitant effect to all constitutional provisions. See Jubelirer, 953 A.2d at 528; Sprague v. Casey, 550 A.2d 184, 191 (Pa. 1988); Cavanaugh v. Davis, 440 A.2d 1380, 1381-82 (Pa. 1982). This rule of constitutional interpretation reflects an understanding that our charter is a fundamental document, which, in recognizing citizens' rights and establishing government, provides essential checks and balances whose complexity is to be neither undervalued nor disregarded. See, e.g., Driscoll v. Corbett, 69 A.3d 197 (Pa. 2013) (interpreting Article V, Section 16(b) vis-à-vis relevant provisions of Declaration of Rights); Robinson Twp., 83 A.3d at 946-50 (placing Article I, Section 27 within constitutional context). Additionally, reliance upon legislative

---

(…continued)

overarching task is to determine the intent of voters who ratified the constitution. In furtherance of this aim, courts reference, *inter alia*, text; history (including 'constitutional convention debates, the address to the people, [and] the circumstances leading to the adoption of the provision'); structure; underlying values; and interpretations of other states." Robinson Twp., 83 A.3d at 944 (quoting Thomas G. Saylor, PROPHYLAXIS IN MODERN STATE CONSTITUTIONALISM: NEW JUDICIAL FEDERALISM AND THE ACKNOWLEDGED PROPHYLACTIC RULE, 59 N.Y.U. Annual Survey of Am. L. 283, 290–91 (2003) (footnotes omitted) (focusing on state provisions that have federal counterparts, and in context of prophylactic rules, author observes that, in era of new federalism, there is diversity but also some consensus among state courts in approach to development of constitutional decisional law)); accord Robert F. Williams, THE BRENNAN LECTURE: INTERPRETING STATE CONSTITUTIONS AS UNIQUE LEGAL DOCUMENTS, 27 Okla. City U.L. Rev. 189, 194-95 & 200 (2002) (state constitutions, ratified by electorate, are characterized as "voice of the people," which invites inquiry into "common understanding" of provision; relevant considerations include constitutional convention debates that reflect collective intent of body, circumstances leading to adoption of provision, and purpose sought to be accomplished).

history, especially those statements memorializing the intent of individual framers, is particularly suspect in a constitutional context because the emphasis in constitutional construction is upon the intent of the ratifying citizenry. Accord Commonwealth ex rel. MacCallum v. Acker, 162 A. 159, 160 (Pa. 1932). As a practical matter, the ratifying voters can hardly be deemed to have approved a supposed intention that is not fairly encompassed in the language of the provision put before them. Long ago, in Commonwealth v. Balph, 3 A. 220 (Pa. 1886), the Court explained the reasons for exercising restraint in relying on constitutional debates to resolve interpretative disputes:

> In the consideration and discussion of this section of the [C]onstitution we throw out of view the copious citations which have been furnished us from the debates in the convention. They are of value as showing the views of individual members, and as indicating the reasons for their votes; but they give us no light as to the views of the large majority who did not talk; much less of the mass of our fellow citizens whose votes at the polls gave that instrument the force of fundamental law. We think it safer to construe the [C]onstitution from what appears upon its face, nor do we propose to go beyond the necessities of this case. Other delicate questions may arise in the future upon this section, and we leave them until they are presented.

Id. at 229; accord Bowers v. Pa. Labor Relations Bd., 167 A.2d 480, 487 (Pa. 1961) (relevancy of constitutional debates limited). For these reasons, examination of the purposes and policies underlying constitutional provisions is not "routinely" performed and becomes appropriate "only when a constitutional precept contends with a precept of equal or greater authority. . . . Then it devolves upon the Court to discern which should control the facts presented, by among other things, assessing the purposes and policies underlying each." In Re: Interbranch Comm'n on Juvenile Justice, 988 A.2d 1269, 1273 (Pa. 2010) ("ICJJ") (quoting JIRB Subpoena, 517 A.2d at 953). The Pennsylvania Constitution and the Judicial Code do not expressly address questions regarding the

Court's jurisdiction and power to act in cases such as that of Judge Bruno. The authority and the respective spheres within which the CJD and the Supreme Court operate are a function of their respective roles -- constitutional and statutory -- within the structure of Pennsylvania's judiciary.

## A.    The Court of Judicial Discipline

In May 1993, the voters approved an amendment to Section 18 of Article V of the Pennsylvania Constitution, which created the Judicial Conduct Board as a prosecutorial body, and the Court of Judicial Discipline as an adjudicatory body. See ICJJ, 988 A.2d at 1273 n.4. Section 18 addresses, among other things, the composition of the CJD. The CJD consists of eight members: three judges, one magisterial district judge, two non-judge attorneys, and two non-lawyer electors. Of these members, four are appointed by the Supreme Court and four are appointed by the Governor, each for a term of four years. Members cannot serve consecutive terms; any additional term can only follow after a year in which the person was not on the CJD. As a result, the CJD is not devised for easy decisional continuity. The members of the CJD are unpaid, entitled only to reimbursement of expenses, and by constitutional command not all are judges, and not all can be lawyers. In essence, it is a court of citizen volunteers, who should be commended and deeply appreciated for their donation of time and talents to the betterment of the cause of justice. See PA. CONST. art. V, § 18(b)(1)-(3).

Section 18 makes clear that the CJD is a court of extremely limited jurisdiction and power, passing upon a single subject matter. The provision authorizes the CJD to review and decide formal disciplinary charges filed by the Board against judicial officers, including magisterial district judges. See PA. CONST. art. V, § 18(b)-(d); 42 Pa.C.S. § 1604; accord 42 Pa.C.S. §§ 3331-32 ("suspension, removal, discipline and compulsory

retirement of magisterial district judges" governed by Article V, Section 18). The CJD has the authority to "order removal from office, suspension, censure or other discipline" of jurists. PA. CONST. art. V, § 18(b)(5). The CJD is not the highest authority, even within its sphere: final decisions of the CJD are subject to direct appellate review by the Supreme Court, upon application of the jurist or of the Board.[14] See PA. CONST. art. V, §§ 9 & 18(c)(1)-(3); see also In Re: Carney, 79 A.3d 490, 509-10 (Pa. 2013) (reversing CJD's decision to dismiss Board's complaint relating to jurist's conduct in road rage incident, which was held to constitute "disrepute" in violation of Article V, Section 18(d)(1) of Pennsylvania Constitution; remand for proceedings to determine sanction).

The CJD has original jurisdiction over actions alleging judicial wrongdoing prosecuted by the Board. See PA. CONST. art. V, § 18(b)(5). The Supreme Court has exclusive jurisdiction over appeals from the CJD. 42 Pa.C.S. § 725(2); see PA. CONST. art. V, § 18(c)(1).

Section 18(b) denominates the CJD a court of record, which is to conduct hearings "in accordance with the principles of due process and the law of evidence" and whose decisions must be in writing and must contain findings of fact and conclusions of law. PA. CONST. art. V, § 18(b)(5). Members of the CJD enjoy immunity "from suit for all conduct in the course of their official duties." PA. CONST. art. V, § 18(b)(6).

Section 18(d) demarcates the constitutional bounds of the CJD's authority. The CJD may act in enumerated circumstances to issue orders involving a jurist subject to disciplinary action. The actions which the CJD may take against a jurist are also

---

[14] The only exception is where a Justice of the Supreme Court is subject to CJD discipline. See PA. CONST. art. V, § 18(c)(1). An appeal from a disciplinary decision implicating a Justice is subject to review by a special tribunal selected from among judges of the intermediate appellate courts.

specified; such actions include suspension or removal from office, and forfeiture of judicial office. See PA. CONST. art. V, § 18(d)(1), (3)-(4). Additionally, the CJD is empowered to order the interim suspension, with or without pay, of any jurist "against whom formal charges have been filed with the [CJD] by the [B]oard or against whom has been filed an indictment or information charging a felony." PA. CONST. art. V, § 18(d)(2).

As an Article V adjudicative body and a "court of record," the CJD is a part of the Unified Judicial System. The Constitution states that enumerated courts of the Commonwealth and magisterial district judges, in addition to "such other courts as may be provided by law," compose the Unified Judicial System. See PA. CONST. art. V, § 1. Among such other courts for which "law" provides -- here, the Constitution -- is the CJD. See PA. CONST. art. V, § 18(b); 42 Pa.C.S. §§ 1601-1606.[15]

### B.   The Supreme Court of Pennsylvania

### 1.   Constitutional and Statutory Framework

The Unified Judicial System exercises the judicial power of the Commonwealth. See PA. CONST. art. V, § 1. At the apex of the Unified Judicial System is the Pennsylvania Supreme Court. PA. CONST. art. V, § 2(a) (Supreme Court is "highest court" of the Commonwealth). In its capacity as the highest court of the Commonwealth, the Supreme Court is vested with important constitutional and statutory powers and responsibilities. The structure and composition of the Court ensure a

---

[15]   Parenthetically, other provisions confirm that the CJD is a part of the Unified Judicial System. For example, funding for the CJD is secured as part of the annual budget request by the Supreme Court on behalf of the Judicial Branch to the General Assembly. PA. CONST. art. V, § 18(b)(4); 42 Pa.C.S. § 1603.

measure of experience, stability and continuity, and place the Court in a position to call upon the broad experience of its members in matters affecting all aspects of the Unified Judicial System, while remaining accountable to the public.

The Supreme Court is composed of seven members, all of whom are members of the Pennsylvania bar, who are elected statewide, not appointed (except in cases of intra-term vacancy), and serve ten-year terms. There is no restriction upon consecutive terms of service (excepting age). Following initial contested elections, Justices may obtain successive terms by way of non-partisan, uncontested retention elections, that permit electors to indicate their confidence in the jurist by a yes or no vote. Justices are salaried, with the amount set by the General Assembly, but with a constitutional protection against diminution in salary intended to protect the independence of the judicial branch. See generally Stilp, 905 A.2d 918.[16]

The Constitution is explicit regarding the breadth of the Court's authority over the Unified Judicial System. In the Supreme Court "shall be reposed the supreme judicial

---

[16] By way of illustration respecting the stability and continuity of the Court, the Chief Justice is determined by seniority. See PA. CONST. art. V, § 10(d); Pa. R.J.A. No. 706(a). The last six Chief Justices assumed that role with the following years of Court service under their belts: Castille (14); Cappy (13); Zappala (19); Flaherty (17); Nix (12); Roberts (20). Mr. Chief Justice Roberts, the last chief justice elected under the provisions of the Constitution of 1874, was also the last of the 21-year term justices: under that charter, justices served a single 21-year term. Of the Justices currently on the Court, many have over a decade of experience on this Court, and all have been in continuous judicial service for over a decade: Castille (21st year on the Court); Saylor (17th year on the Court, preceded by service on the Superior Court); Eakin (13th year on the Court, preceded by service on the Superior Court); Baer (11th year on the Court); Todd (7th year on the Court, preceded by service on the Superior Court); McCaffery (7th year on the Court, preceded by service on the Superior Court). Mr. Justice Stevens, before his appointment to this Court in 2013, had served on the Superior Court for 16 years, including as President Judge of that Court for two years. In addition, Justices Baer, McCaffery, and Stevens all have experience as trial judges.

power of the Commonwealth." PA. CONST. art. V, § 2(a). Moreover, in addition to its judicial power, the Supreme Court has "general supervisory and administrative authority over all the courts and [magisterial district judges] . . . ." PA. CONST. art. V, § 10(a). The Judicial Code helps to implement the primacy of the Supreme Court within the Unified Judicial System. See 42 Pa.C.S. § 501 (derived from PA. CONST. art. V, § 2). The General Assembly has also recognized that the Court has "[a]ll powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law" and any powers vested in it by statute, including the Judicial Code. 42 Pa.C.S. § 502. Section 1701 of the Judicial Code states that the Court has general supervisory and administrative authority over the judicial system and may exercise powers enumerated in subsequent provisions "in aid" of that authority. 42 Pa.C.S. § 1701 (derived from PA. CONST. art. V, § 10(a)). The enumerated powers include authority over "all courts and magisterial district judges" and over "personnel of the system." 42 Pa.C.S. §§ 1723, 1724. Personnel of the system include "judicial officers," among them magisterial district judges. See 42 Pa.C.S. § 102 (definitions: personnel of the system, judicial officers, judges).

As part of its administrative responsibility, the Court oversees the daily operations of the entire Unified Judicial System, which provides a broad perspective on how the various parts of the system operate together to ensure access to justice, justice in fact, and the appearance that justice is being administered even-handedly. See PA. CONST. art. V, § 10 (judicial administration). One aspect of this responsibility is management of judicial personnel. Thus, for example: (1) the Chief Justice, acting upon requests from the AOPC, may assign additional jurists to temporary judicial service on any court; (2) the Court may certify jurists for senior status, and these jurists may be assigned by the Chief Justice as needed; and (3) the Court approves jurists for

assignment or re-assignment to divisions of the courts of common pleas.  See PA. CONST. art. V, §§ 10(a), 16(c); Pa. R.J.A. Nos. 701, 702.  Judicial leave is monitored by the Supreme Court, and jurists are required to file reports related to the status of cases submitted to them for adjudication.  Pa. R.J.A. Nos. 703, 704.  The AOPC records, reviews, and reports to the Supreme Court on matters related to the operation and efficiency of the Unified Judicial System and its component parts; system personnel are expected to cooperate with the AOPC in these respects and any failure to cooperate is referred to the Supreme Court for review.  See PA. CONST. art. V, § 10(b); Pa. R.J.A. Nos. 505, 506; 701-704.

Another important facet of judicial administration is the authority to devise rules of procedure governing adjudications before inferior tribunals (excepting the CJD).  See PA. CONST. art. V, § 10(c).  While the CJD is permitted to devise its own rules of procedure, the CJD is nevertheless bound in its substantive task to take general direction from the Supreme Court, as this Court is responsible for the substance of the codes of conduct that govern Pennsylvania jurists, which the CJD enforces, and our interpretation of those codes controls.  See PA. CONST. art. V, § 10(c); see also Pa. Code of Jud. Conduct Canon 1 et seq.; Pa. St. Mag. Dist. J. Rule 1 et seq.; Carney, supra. Additionally, the Court regulates the conduct of jurists via the Rules of Judicial Administration.  Notably among the Rules of Judicial Administration is the requirement that any jurist who receives notice that s/he is the subject of any federal or state criminal investigation must report the receipt of that notice in writing to the Chief Justice within five days of its receipt.  Pa. R.J.A. No. 1921.

Moreover, the Court oversees judicial education, whether of judges who are law-trained or of non-attorney jurists via dedicated courses of training and instruction.  See PA. CONST. art. V, § 12 (magisterial district judges "shall be members of the bar of the

Supreme Court or shall complete a course of training and instruction in the duties of their respective offices and pass an examination prior to assuming office. Such courses and examinations shall be as provided by law."); 42 Pa.C.S. § 3112 (same); 42 Pa.C.S. § 3113 (subject to approval of Supreme Court, Minor Judiciary Education Board to prescribe subject matter and examination for course of training and instruction required of magisterial district judges and other judges not members of bar); 42 Pa.C.S. §§ 2132-34 (members, officers, and staff of Minor Judiciary Education Board appointed by, or with authorization of, Supreme Court); 42 Pa.C.S. § 3118 (continuing legal education for magisterial district judges); Pa. St. Mag. Dist. J. Rule Nos. 19-21. And, for all members of the Unified Judicial System, the Court provides training to maintain professional competence under the auspices of the AOPC. Finally, the Court is responsible for aspects of the legal profession involving the members of the judiciary indirectly: thus, we oversee bar admission, continuing legal education of attorneys, and are responsible for the Rules of Professional Conduct that govern lawyers and attorney discipline. See PA. CONST. art. V, § 10(c); see also Pa. Rules of Prof'l Conduct 1.0 et seq.

In addition to its general powers of adjudication, supervision and administration, the Supreme Court also has "the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722." 42 Pa.C.S. § 502 (derived from Judiciary Act of May 22, 1722, 1 Smith's Law 131). The Judicial Code recognizes that these additional powers are vested in the Supreme Court by the Constitution of Pennsylvania. Id. The Pennsylvania Constitution confirms that the Supreme Court retains all powers vested in the Court at the time of the 1968 amendments of Article V, amendments that realized significant reform and

modernization of Pennsylvania's judicial branch. PA. CONST. SCHED. art. V, § 1.[17] The Court has explained that its powers may be continued by statute "so far as they are unimpaired by our constitutions, state and national." Chase v. Miller, 41 Pa. 403, 411 (Pa. 1862).

To aid in the exercise of these powers, the Court has such jurisdiction as "shall be provided by law." PA. CONST. art. V, § 2(c). Section 721 of the Judicial Code enumerates the types of cases over which the Court has original jurisdiction: *habeas corpus*, mandamus or prohibition to courts of inferior jurisdiction, and *quo warranto* as to any officer of statewide jurisdiction. 42 Pa.C.S. § 721. Sections 722 through 725 describe the Supreme Court's appellate jurisdiction. Section 726 addresses the Court's extraordinary jurisdiction to take cognizance, *sua sponte* or upon petition of a party, of any matter pending before an inferior tribunal "involving an issue of immediate public importance." 42 Pa.C.S. § 726. In addition, the schedule to Article V of the Constitution continues post-ratification the jurisdiction vested in the Supreme Court in 1968 -- such as the jurisdiction of the King's Bench. PA. CONST. SCHED. art. V, § 1; see, e.g., City of Philadelphia v. Int'l Ass'n of Firefighters, Local 22, 999 A.2d 555 (Pa. 2010) (Supreme Court exercised King's Bench jurisdiction to review arbitration award upon writ of certiorari, where right of appeal was statutorily prohibited).

## 2. King's Bench Powers Generally

Particularly relevant to the dispute *sub judice*, as the parties recognize, are the powers and jurisdiction of the Court at King's Bench. In 1968, upon amendment of the

---

[17] The schedule is a part of the Constitution and it is intended that its provisions "have the same force and effect as those contained in the numbered sections of [Article V]." PA. CONST. SCHED. Preamble.

Constitution and as before, the people positioned the Supreme Court "in the same relation" to all inferior tribunals as the justices of the King's Bench at Westminster had occupied on May 22, 1722. PA. CONST. SCHED. art. V, § 1; 42 Pa.C.S. § 502; Commonwealth v. Ickhoff, 33 Pa. 80, 80-81 (Pa. 1859); see Stander v. Kelley, 250 A.2d 474, 483 (Pa. 1969) (plurality opinion) (summarily finding no merit to appellants' contention that Pennsylvania Constitution of 1968 infringed upon King's Bench powers of Supreme Court). In Stander, a three-Justice concurrence expanded upon the Court's holding to explain that the judicial power of the Court continued as it existed before the 1968 amendments. 250 A.2d at 487 (Roberts, J., concurring, joined by Jones and Pomeroy, JJ.).[18] The concurrence noted that "some" of the original King's Bench powers of the Court were recited in the newly-ratified 1968 Constitution, among them the authority to remove and discipline judges, the authority to transfer judicial manpower, and the general supervisory and administrative authority of the Supreme Court over all other courts and justices of the peace (now, magisterial district judges). Id. at 486-87 (citing PA. CONST. art. V, §§ 2, 10, 18). Derived from the continuing authority at King's Bench, the Court possesses "every judicial power that the people of the Commonwealth can bestow under the Constitution of the United States," whether enumerated in the Constitution or residual. See id. at 487 (citing PA. CONST. art. V, § 2). In this sense, King's Bench powers exist independently of any statutory grant of jurisdiction. Housing Auth. of County of Chester, 730 A.2d at 941 n.13; accord Stander,

---

[18] Although the concurrence in Stander stated that those three Justices concurred in the result, the expression offered no disagreement with the lead opinion; indeed, Justice Roberts began his expression by explaining that he wrote separately only because he "deem[ed] it appropriate to discuss further appellants' contentions dealing with the abrogation of the right to *habeas corpus*, the right to civil jury trial and the King's Bench powers of this Court." 250 A.2d at 485.

250 A.2d at 487 (Roberts, J., concurring) ("judicial power reposed in this Court will continue as before, unimpaired by any mistaken notion that the Legislature has the constitutional authority to diminish, curtail or interfere with its functions").

The Constitution of 1968 also explicitly recognized several of the responsibilities of the Court which had been exercised, before then, via King's Bench. For example, the Court's earliest uses of the King's Bench power commonly implicated common law writs, primarily writs of error, writs of certiorari, and writs of mandamus and prohibition. See Pa. Labor Relations Bd. v. Butz, 192 A.2d 707, 709-10 (Pa. 1963) (citing Pollock and Maitland, History of English Law before Edward I) (footnote omitted) ("Alone of English judicial tribunals, the High Courts of Westminster had the power to issue the great prerogative writs of prohibition, certiorari, mandamus and *quo warranto*. These writs, unlike other writs, were not mere formal judicial tools but rather weapons wielded by the judicial arm of the Crown to curb ecclesiastical and baronial encroachments and, as such, they were, as a matter of policy, used but sparingly and only when no other remedy savoring less of monarchial arbitrariness was available."); see, e.g., Petition of Bell, 152 A.2d 731, 739 (Pa. 1959) (writ of certiorari); Martonick v. Beattie, 117 A.2d 715, 717 (Pa. 1955) (writ of certiorari); Carpentertown, 61 A.2d at 428-29 (writ of prohibition); Schmuck v. Hartman, 70 A. 1091, 1092 (Pa. 1908) (writ of certiorari); Appeal of Comm'rs of Northampton County, 57 Pa. 452, 453-54 (Pa. 1868) (writ of certiorari); Commonwealth v. McCloskey, 2 Rawle 369, 379-80 (Pa. 1830) (writ of *quo warranto*); Ebersoll v. Krug, 3 Binn. 528, 528 (Pa. 1811) (writ of error); Livezey v. Gorgas, 2 Binn. 192, 194 (Pa. 1809) (writ of certiorari). In these instances, the Court afforded relief or review of inferior tribunal decisions for which existing law did not provide or which existing law prohibited. See, e.g., Schmuck, 70 A. at 1092 (where no

statutory right of appeal exists, Supreme Court may review decision at King's Bench upon writ of certiorari).

The 1968 Constitution explicitly articulated a "right of appeal" which obviously diminished the necessity of the resort to common law writs of error or certiorari employed by the Court at King's Bench. See PA. CONST. art. V, § 9 ("There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law."). Notably, however, the Court has deemed the writ of certiorari to be viable in circumstances where the Court's duties might not otherwise be dischargeable. See, e.g., City of Philadelphia, 999 A.2d at 563 (arbitration awards, which are not appealable by statute, are reviewed by Court pursuant to certiorari procedure effecting King's Bench authority "because, among other things, no adjudicatory body has unlimited discretion, and each and every adjudicator is bound by the Constitution and particularly by the mandates of due process."); accord City of Philadelphia v. Chase & Walker Corp., 240 A.2d 65, 68 (Pa. 1968) (extension of Superior Court's statutory jurisdiction enacted to overcome effect of Bell, 152 A.2d 731, which held that Superior Court lacked subject matter jurisdiction over appeal because General Assembly did not grant right to appeal decision of county court; review available only within Supreme Court's King's Bench jurisdiction upon writ of certiorari).

The General Assembly has also standardized procedures for pursuing *quo warranto*, mandamus, prohibition, and *habeas corpus* relief. See 42 Pa.C.S. §§ 721, 9541-9546; see, e.g., Commonwealth v. Fahy, 737 A.2d 214, 223-24 (Pa. 1999) (Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, subsumes writ of *habeas*

*corpus* with respect to remedies offered by Act; reject request to review at King's Bench merits of statutorily time-barred claim). Again, however, these codifications do not affect the judicial power to employ the writs in appropriate circumstances, where no other vehicle is available; and, in the case of *habeas corpus*, the General Assembly has explicitly recognized the fact. 42 Pa.C.S. § 6501 ("The privilege of the writ of *habeas corpus* shall not be suspended, unless when in the case of rebellion or invasion the public safety may require it."); see also Commonwealth v. Judge, 916 A.2d 511, 518-21 (Pa. 2007). Furthermore, in implementing legislative provisions addressing the Court's traditional powers -- again, as demonstrated most clearly in the case of *habeas corpus* -- the Court has stressed the need to engage in broad constructions so as to avoid tension with the traditional scope of the writ. See, e.g., Commonwealth v. Haun, 32 A.3d 697, 702–05 (Pa. 2011); Commonwealth v. Cruz, 851 A.2d 870, 877–78 (Pa. 2004).

Another example of the Court's residual powers, even in the face of narrowing legislation, may be found in cases arising under the Sentencing Code. The General Assembly has severely limited the Court's jurisdiction to review on allocatur claims that implicate the discretionary aspects of sentencing. See 42 Pa.C.S. § 9781(f) ("No appeal of the discretionary aspects of the sentence shall be permitted beyond the appellate court that has initial jurisdiction for such appeals."). This Court has construed the provision so as not to hinder the Court's ability to review the Superior Court's application of governing legal principles in the discretionary sentencing arena. See Commonwealth v. Smith, 673 A.2d 893, 895 (Pa. 1996); accord Commonwealth v. Walls, 926 A.2d 957, 968 (Pa. 2007). Given the Court's supervisory responsibility, and the need for consistent review paradigms in Pennsylvania, the approach could hardly be otherwise.

The General Assembly has also codified the Court's power to exercise plenary jurisdiction "in any matter . . . involving an issue of immediate public importance" pending before an inferior tribunal at any stage, for the purposes of "enter[ing] a final order or otherwise caus[ing] right and justice to be done."  42 Pa.C.S. § 726 (extraordinary jurisdiction); see In re Dauphin County Fourth Investigating Grand Jury, 943 A.2d 929, 933 n.3 (Pa. 2007) (Court takes cognizance pursuant to Section 726 of matters pending before lower tribunal, and at King's Bench to exercise supervisory power, when no matter is pending before lower court); Avellino I, 690 A.2d at 1140-41 (same); Pa.R.A.P. 3309(a) (same); see, e.g., Joseph v. Scranton Times L.P., 987 A.2d 633, 636 (Pa. 2009) (per curiam) (Court exercised supervisory power in matter over which it took cognizance via extraordinary jurisdiction).

The Constitution of 1968 further addressed expressly the authority of the Court to undertake specific administrative and supervisory tasks, which in the past had been the subject of Supreme Court action premised upon the King's Bench power.  Compare, e.g., PA. CONST. art. V, § 10(a) with In re Carbon County Judicial Vacancy, 141 A. 249 (Pa. 1928) (relating to temporary assignments of judges to fill vacancies on bench); PA. CONST. art. V, § 10(e) with In re President Judge for 30th Judicial Dist., 216 A.2d 326 (Pa. 1966) (relating to establishment of priority of judicial commission).  Importantly, although the 1968 Constitution enumerated certain of the King's Bench powers, the Constitution and the Judicial Code continue to recognize that the Court's King's Bench authority is broader still.  See Commonwealth v. Reilly, 188 A. 574, 581 (Pa. 1936) (statute addressing change of venue did not impair Supreme Court's supervisory powers to direct change of venue but made occasions for use of writ of certiorari for such purposes fewer because parties could seek statutory relief); Fahy, 737 A.2d at 224 (same, respecting habeas corpus).  The King's Bench power and jurisdiction of the

Supreme Court continues today, in accordance with the following well-established principles.

The Supreme Court in 1859 explained that "justices of the King's Bench are the supreme and general justices (*capitales et generales*) of the kingdom, these terms indicating both the order and the extent of their jurisdiction." Ickhoff, 33 Pa. at 81. The 1968 Constitution articulated this concept in Sections 2 and 10 of Article V, which denominate the Court as the "supreme" judicial power in the Commonwealth and the "general" supervisory and administrative authority over all inferior tribunals in the Commonwealth. See PA. CONST. art. V, §§ 2(a), 10(a). In 1862, the Supreme Court noted that the abiding authority at King's Bench "is a large charter. There is no temptation to widen it by judicial construction -- the inclination of the judicial mind is rather to narrow it. But as it is a trust for the people of Pennsylvania, judges have no right, from motives of ease and convenience, to surrender, weaken, or obscure, by judicial refinements, one single one of the powers granted." Chase, 41 Pa. at 411.

By its "supreme" nature, the inherent adjudicatory, supervisory, and administrative authority of this Court at King's Bench "is very high and transcendent." See Commonwealth v. Chimenti, 507 A.2d 79, 81 (Pa. 1986) (citing Blackstone, Book 3, ch. 4, § 42 and Commonwealth v. Onda, 103 A.2d 90, 91 (Pa. 1954)); accord Respublica v. Cobbet, 3 Yeates 93, 1800 WL 2553 at *3 (Pa. 1800) ("The justices of the Court of King's Bench are stiled [sic] the keepers of the morals of the kingdom of England; so are the justices of the Supreme Court as to this state."). The exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; the Court may employ any type of process or procedure necessary for the circumstances. Franciscus, 369 A.2d at 1192-93 (citing Petition of Squires & Constables Ass'n of Pa., 275 A.2d 657 (Pa. 1971)); Carpentertown, 61 A.2d

at 428-29 (same); Schmuck, 70 A. at 1092. The Court necessarily may exercise the powers and jurisdiction of the King's Bench *sua sponte*. See, e.g., Chimenti, 507 A.2d at 81 (invoking King's Bench powers, Court reviewed *sua sponte* question of whether Superior Court had power to entertain plea bargain after trial court entered judgment of sentence).

Not all of these exercises of power result in published decisions; thus, a survey of the Pennsylvania Reporter does not account for the parameters of the Court's authority. For example, in 2000, the Court *sua sponte* issued an order on the Judicial Administration Docket, unrelated to any particular case then before it, declaring that criminal defendants with a right of direct appeal to the Superior Court no longer had to seek allocatur in order for their claims to be deemed exhausted for purposes of federal *habeas corpus* review. See In Re: Exhaustion of State Remedies in Criminal & Post Conviction Relief Cases, No. 218 Jud. Admin. Docket No. 1 (Pa. May 9, 2000) (*per curiam).*[19]

---

[19] The exhaustion order reads:

> **AND NOW***,* this 9th day of May, 2000, we hereby recognize that the Superior Court of Pennsylvania reviews criminal as well as civil appeals. Further, review of a final order of the Superior Court is not a matter of right, but of sound judicial discretion, and an appeal to this Court will only be allowed when there are special and important reasons therefor. Pa.R.A.P. 1114. Further, we hereby recognize that criminal and post-conviction relief litigants have petitioned and do routinely petition this Court for allowance of appeal upon the Superior Court's denial of relief in order to exhaust all available state remedies for purposes of federal *habeas corpus* relief.
>
> In recognition of the above, we hereby declare that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for

(continued…)

Similarly, to give full effect to its authority, the Court may assume plenary jurisdiction over a matter even where no dispute is pending in a lower court. Avellino I, 690 A.2d at 1140; Balph, 3 A. at 226 (Supreme Court at King's Bench, "by the plenitude of its power, may as well proceed on indictments removed by *certiorari* out of inferior courts as on those originally commenced here"); see, e.g., Creamer v. Twelve Common Pleas Judges, 281 A.2d 57, 58 (Pa. 1971) (*per curiam*) (Supreme Court exercised King's Bench jurisdiction to review validity of governor's judicial appointments where no legal action was pending); Summers v. Kramer, 114 A. 525, 527-28 (Pa. 1921) (Supreme Court exercised King's Bench jurisdiction to resolve dispute between judicial officers over payment to contractor examining common pleas files and records where no legal action was pending).

The "general" quality of the Court's authority at King's Bench denotes that the justices of the Court have cognizance of all causes statewide, whether civil or criminal. Summers, 114 A. at 528; Balph, 3 A. at 225 (quoting Blackstone, Book 3, ch. 4, § 42) (Supreme Court "takes cognizance both of criminal and civil causes"); Commonwealth v. Simpson, 2 Grant 438, 439 (Pa. 1854) (same). The Court exercises a comprehensive jurisdiction over civil and criminal causes, which includes the competence to examine and decide, or to review decisions, relating to the type of

---

(…continued)

> rehearing or allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have exhausted all available state remedies respecting a claim of error. When a claim has been presented to the Superior Court, or to the Supreme Court of Pennsylvania, and relief has been denied in a final order, the litigant shall be deemed to have exhausted all available state remedies for purposes of federal *habeas corpus* relief. This Order shall be effective immediately.

causes committed generally or otherwise to an inferior jurisdiction. See In re Pollard, 17 A. 1087, 1090 (Pa. 1889). The Court has explained that the authority and jurisdiction to examine and decide matters in the first instance "means something more than the trial of the case before a jury," as the exercise of the King's Bench jurisdiction "is not, strictly speaking, [the exercise of] original jurisdiction." Balph, 3 A. at 230. The purpose of its exercise is not to permit or encourage parties to bypass an existing constitutional or statutory adjudicative process and have a matter decided by this Court, but aids the Court in its duty to keep all inferior tribunals within the bounds of their own authority. See id.; Onda, 103 A.2d at 91; see, e.g., Fahy, 737 A.2d at 224; Reilly, 188 A. at 581.

Indeed, the Court will generally employ the King's Bench authority when the issue requires timely intervention by the court of last resort of the Commonwealth and is one of public importance. See In re President Judge for 30th Judicial Dist., 216 A.2d at 326; accord In re Smith's Estate, 275 A.2d 323, 326 (Pa. 1971) (circumstances did not warrant exercise of Court's supervisory authority and general power to "minister justice"). The King's Bench power is "exercised with extreme caution. . . . That it may be abused is possible." Balph, 3 A. at 230. But, the availability of the power is essential to a well-functioning judicial system; and it appears that this is a point that is difficult to fully appreciate without having served on the Court. The author of the opinion in Balph explained:

> I can readily imagine circumstances in the future which would make the exercise of this power the only barrier between a good citizen and gross oppression. If the people shall be of opinion that it was unwisely conferred, or that it is being improperly exercised, they can change it by a modification of fundamental law. The mere knowledge that such a power exists in th[e Supreme C]ourt it is believed will make its frequent use unnecessary.

Id.  The Court has generally called upon the powers of the King's Bench to supplement existing procedural processes that had proven inadequate to carry out the judicial, administrative, or supervisory obligations of the Court in a manner that is expeditious and determinate.  King's Bench authority "commands magistrates and others to do what their duty requires in every case where there is no other specific remedy.  It protects the liberty of the subject by speedy and summary interposition."  Commonwealth v. Beaumont, 4 Rawle 366, 367 (Pa. 1834) (quoting Blackstone Book 3, ch. 4, § 42).  In certain instances, the Court cannot suffer the deleterious effect upon the public interest caused by delays incident to ordinary processes of law, or deficiencies in the ordinary processes of law making those avenues inadequate for the exigencies of the moment.  In short, King's Bench allows the Supreme Court to exercise authority commensurate with its "ultimate responsibility" for the proper administration and supervision of the judicial system.  Avellino I, 690 A.2d at 1144 n.7.

We have often undertaken flexible measures deriving from our broad power at King's Bench.  Perhaps the most notable examples of the flexibility necessary for this Court to ensure the integrity of the judiciary arose in our response to the revelation of criminal charges involving two trial judges in Luzerne County, Michael T. Conahan and Mark A. Ciavarella, Jr.  The federal government announced guilty plea arrangements with the judges in January of 2009, and the Court responded by immediately suspending Ciavarella and revoking the certification of Conahan as a senior judge.  When it materialized that the judges' illegal conduct also called into question the legitimacy of adjudications of delinquency and other dispositions in juvenile matters presided over by Ciavarella, the Court appointed the Honorable Arthur E. Grim, a Senior Judge from Berks County, to serve as its Special Master to review all Luzerne County juvenile court adjudications and dispositions that had been affected by Ciavarella's

criminal actions, and to make recommendations to the Court concerning appropriate remedial actions to rectify the situation as fairly and swiftly as possible. The Court retained jurisdiction of the matter *sub nomine* In re J.V.R. Order (docketed at 81 MM 2008), 2/11/2009 (*per curiam*) (citing PA. CONST. art. V, § 10; 42 Pa.C.S. § 502). We appointed Judge Grim as our Master in order to determine the effects of Ciavarella's misconduct upon the minors who had appeared before him in juvenile court.

The Court assumed "plenary jurisdiction over th[e] matter" and acted to afford relief -- starting with the appointment of Judge Grim as the Court's Master, premised upon the Court's constitutional power to supervise inferior tribunals and Section 502 of the Judicial Code, which describes the King's Bench authority of the Court. The Court also directed the President Judge of the Luzerne County Court of Common Pleas to file monthly reports detailing significant events and actions taken to improve the functioning of that court and access to justice. See FINAL REPORT ON IMPLEMENTATION ON RECOMMENDATIONS OF THE INTERBRANCH COMMISSION ON JUVENILE JUSTICE at 1-5 (April 8, 2013) ("Final Report"), online at www.pacourts.us/assets/files/setting-2032/file-2570.pdf?cb=9e7037 (last accessed on September 18, 2014).[20]

Judge Grim filed multiple reports and recommendations, upon which the Court acted at King's Bench to vacate adjudications of delinquency and consent decrees in all cases in which Ciavarella acted between January 1, 2003 and May 31, 2008. Moreover, the adjudications of delinquency and consent decrees were reversed and

---

[20] This report also addresses the amendments to the rules of procedure and administration adopted in response to the recommendations of the Interbranch Commission on Juvenile Justice. Notably, the Court adopted Rules of Judicial Administration 1920 through 1922, which require a jurist to inform the Chief Justice within five days if s/he receives notice of an investigation by law enforcement, "in order for the Supreme Court to take appropriate action to prevent further misconduct and to remove a judicial officer from his or her position." Final Report at 2-3.

dismissed with prejudice, and the records of juvenile defendants were expunged: (1) in all cases, whether final or not, where a juvenile either proceeded before Ciavarella without counsel, or was committed by Ciavarella to PA Child Care or Western PA Child Care, the two juvenile facilities whose owner, Attorney Robert Powell, had secretly paid Ciavarella and Conahan; (2) in any remaining cases that proceeded before Ciavarella and were final, with copies of the records to be retained under seal in accordance with any other order of court; and (3) with respect to those remaining cases that were not yet final, the Luzerne County District Attorney was directed to submit a document under seal to Judge Grim identifying the specific juvenile cases in which it intended to proceed with further delinquency proceedings, and to file a sealed copy of the document with the Supreme Court Prothonotary's Office. The Court authorized Judge Grim to vacate and dismiss with prejudice 2,401 juvenile adjudications and consent decrees, and to expunge the records, in the remaining cases that were not identified by the Commonwealth as matters that it would intend to pursue. The Court explained that "[t]he situation at hand [wa]s so unique and extreme" that it had warranted exercise of the Court's King's Bench powers, in this fashion, in the interest of justice. The Court agreed with the Special Master that "'neither the victims, the juveniles, nor the community w[ould] benefit by having new proceedings' in cases of juveniles who ha[d] received final discharge either from commitment, placement, probation or any other disposition and referral, and who ha[d] paid all fines, restitution, and fees. In addition, [the Court] note[d] that the Commonwealth, in its objections, ha[d] . . . identified no interest that would be served by permitting reprosecution in th[o]se cases." Order (docketed at 347 Jud. Admin. Docket), 10/29/2009 (*per curiam*). Lastly, in October 2010, this Court authorized Judge Grim to implement the statute adopted by the General Assembly in the wake of the scandal, establishing a special fund to

compensate the young victims of Conahan and Ciavarella's criminal conduct.  Order (81 MM 2008), 10/21/2010 (*per curiam*).

Notably, the procedural and substantive measures we undertook in Luzerne County to provide a broad and appropriate remedy did not derive from any existing rules, statutes, or procedures.  Following the announcement of the federal charges, the power of King's Bench allowed the Court to innovate a swift process and remedy appropriate to the exigencies of the event.  The process and remedy were unrelated to and were unlike any disciplinary action or civil suit brought against Ciavarella or Conahan.[21]

Nor were the Court's remedial actions in Luzerne County, arising from the criminal conduct of sitting jurists, confined to affording affected juveniles a measure of relief.  Thus, in Joseph v. Scranton Times L.P., 19 MM 2009, this Court assumed jurisdiction at King's Bench and appointed a master -- the Honorable William H. Platt -- to preside over a remand of a case involving a defamation action.  The Court concluded

---

[21]    In text, we describe the Court's actions undertaken via King's Bench after revelation of the federal criminal charges lodged against Luzerne County Common Pleas Judges Conahan and Ciavarella, which is the circumstance directly relevant here: what can and should the Court do when a judge faces criminal charges relating to conduct on the bench.  In concurrence, Mr. Justice McCaffery opines that the Court's response in Luzerne County was "slow," a position he justifies only by conflating the pending court actions in Luzerne County as they were challenged prior to the criminal charges being filed with the Court's remedial actions after criminal charges against Conahan and Ciavarella were announced.  Make no mistake: no doubt all members of the Court wish that we could have perceived in the prior circumstances the criminal misconduct in Luzerne County, only made apparent by the filing of federal charges.  But, the hindsight concern is off-point, indeed gratuitous, respecting the discussion here.  Moreover, it is notable that Justice McCaffery never squares his hindsight misgivings with his predicate caution that "members of the judiciary are vulnerable to accusations of wrongdoing by disaffected litigants that are grounded in nothing more than dissatisfaction with the resolution of a case."

that the defendants had proffered evidence, not previously available, regarding the irregular assignment of the case by Conahan and the non-jury trial before Ciavarella, which raised a colorable claim that the judgment in favor of the plaintiffs was tainted by the involvement of the two former jurists. Order (docketed at 19 MM 2009), 4/7/2009 (*per curiam*) (citing 42 Pa.C.S. § 502). The Court explained that "in terms of the present case, an appearance of impropriety in either the assignment or trial of this case is sufficient to establish prejudice." Id. (citing PA. CONST. art. I, § 11; art. V § 10; In Interest of McFall, 617 A.2d 707, 712-13 (Pa. 1992)).

On remand, Judge Platt held a two-day hearing in July 2009 and submitted a thorough and thoughtful report to this Court. Subsequently, this Court reviewed Judge Platt's findings and conclusions *de novo* and endorsed the relief recommended: (1) the judgment in the case was vacated and a new trial was ordered; (2) the defendants' request for an out-of-County judge was denied; and (3) the defendants' failure to request a jury remained binding for purposes of retrial. Joseph, 987 A.2d at 636-37. The Court relied upon its supervisory powers to grant relief: "[t]here is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings. A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety." Id. (citing PA. CONST. art. V, § 10(a); McFall, 617 A.2d at 714). As with our actions respecting juvenile defendants appearing before Ciavarella, our actions in Joseph were not undertaken to **discipline** Conahan and Ciavarella, but to remedy an injustice perpetrated by the duo in a distinct case.

Malinowski v. Nanticoke Micro Technologies, Inc., docketed at 51 MM 2009, was yet another matter arising in the wake of the revelations concerning the criminal conduct of Conahan and Ciavarella. In Malinowski, the Court again acted at King's Bench and remanded the case to the Honorable Chester Muroski of the Luzerne County Court of

Common Pleas for an examination of the plaintiff's allegations that judicial corruption had infected the matter. In the application for exercise of King's Bench jurisdiction, the plaintiff alleged that Conahan had been a member of the Board of Directors for First National Bank, one of the defendants in the Malinowski case, during the pendency of the matter, which was assigned to his co-conspirator Ciavarella for resolution. Furthermore, the plaintiff alleged other questionable ties, including that, in his capacity as president judge of the Luzerne County Court of Common Pleas, Conahan had ordered that all district justice court funds be deposited at First National Bank, and that Ciavarella and Conahan received financing from First National Bank to establish a depository in Jupiter, Florida, for laundering the illegal payments they were receiving from the owner of the juvenile facility to which Ciavarella routinely committed juvenile defendants. Judge Muroski was directed to submit a report and recommendations regarding what, if any, further action should be taken, and the Court retained jurisdiction. Order (51 MM 2009), 8/5/2009 (*per curiam*) (citing 42 Pa.C.S. § 502).

Upon receiving Judge Muroski's report and recommendations, the Court concluded that the record amply supported the finding that there was an appearance of judicial impropriety that required corrective supervisory action. The Court thus vacated orders entered in December 2005 and May 2006, by which Ciavarella had dismissed First National Bank from the action with prejudice and had entered judgment in favor of all other defendants, and remanded the matter to the Luzerne County Court of Common Pleas for further proceedings. The Court granted relief premised upon the same reasoning as in Joseph and rejected arguments that the Superior Court's review of unrelated issues on appeal had cured any appearance of impropriety. Notably, because the plaintiff had exhausted the appeals process, the Court acted upon the miscellaneous filing while no matter was pending before an inferior tribunal, awarding

relief "in the interest of justice, to remedy judicial impropriety, . . . premised upon this Court's supervisory power over inferior tribunals." Order (51 MM 2009), 6/24/2010 (*per curiam*).

Other instances in which the Court has exercised aspects of its flexible and transcendent authority at King's Bench include:

1. Pennsylvania State Ass'n of County Comm'rs v. Commonwealth, 681 A.2d 699 (Pa. 1996) (citing 42 Pa.C.S. § 726): the Court took cognizance of the action in its extraordinary jurisdiction noting the immediate public importance of the matter, and granted the request of the Pennsylvania State Association of County Commissioners for a writ of mandamus to compel the General Assembly to enact a statewide scheme of funding the courts of Pennsylvania. The Court retained jurisdiction and appointed the Honorable Frank J. Montemuro, Jr., as the Court's master, for the purposes of recommending a scheme that would form the basis for the specific implementation of funding to be ordered.

2. Annenberg v. Commonwealth, 757 A.2d 333 (Pa. 1998), and Annenberg v. Commonwealth, 757 A.2d 338 (Pa. 2000): after the Commonwealth Court refused to take cognizance of the matter and remanded the case to the Montgomery County Court of Common Pleas, the Court granted the plaintiff's application for the exercise of extraordinary jurisdiction, 42 Pa.C.S. § 726. Initially, the Court held that the stock clause of the personal property tax, 72 P.S. § 4821, facially discriminated against interstate commerce and was, as a result, unconstitutional. The Court also retained jurisdiction but remanded the matter to the Montgomery County Court of Common Pleas. President Judge Joseph A. Smyth -- serving as a special master for the Court -- held a hearing and issued an interim report on whether the stock clause of the personal property tax was a "compensatory tax." Upon review of the report, the Court concluded "that the portion of the stock clause which excludes from the personal property tax stock held in

companies which are subject to the capital stock and franchise taxes [wa]s unconstitutional."

3.    Commonwealth v. Banks, 943 A.2d 230 (Pa. 2007) (*per curiam*) (citing 42 Pa.C.S. § 726): in December 2004, the Supreme Court assumed plenary jurisdiction over a serial PCRA petition filed by Banks's mother as "next friend" on his behalf, seeking a stay of execution and alleging, *inter alia*, that Banks was incompetent to be executed under Ford v. Wainwright, 477 U.S. 399 (1986).  At the time, there was no formal process -- by statute or Court rule -- in place for the adjudication of Ford v. Wainwright claims.  The Court stayed the warrant of execution, and directed the trial court to hold a competency hearing expeditiously in accordance with Ford v. Wainwright.  The Court retained jurisdiction, employing the trial judge as a master for the Court to decide the question of competency within the narrowly delimited parameters.  (Notably, Conahan served as the trial judge in the matter and failed to act expeditiously or to confine himself to the task devised to him.)  Subsequently, the Court reviewed the Master's report, rejected the Master's adoption of Banks's proposed findings of fact and conclusions of law wholesale, and would have remanded the matter to the Master for an autonomous judicial expression were it not for Conahan's removal from the bench.  The Court remanded the matter for appointment of a new jurist and a *de novo* hearing.  Commonwealth v. Banks, 989 A.2d 1 (Pa. 2009) (*per curiam*).   The Court relinquished jurisdiction in 2011. Commonwealth v. Banks, 29 A.3d 1129 (Pa. 2011).

4.    ICJJ, 988 A.2d 1269: in January 2010, the Supreme Court assumed King's Bench jurisdiction over a petition of the Judicial Conduct Board, in which the Board requested a stay of an ICJJ's subpoena that sought to compel answers from witnesses and the production of documents relating to misconduct complaints as to which formal disciplinary charges had not been filed by the Board.  The Court granted relief in part, holding that the confidentiality clause of Article V, Section 18 prevented discovery of some materials but not others.

5.    Fagan v. Smith, 41 A.3d 816 (Pa. 2012) (*per curiam*): in February 2012, the Supreme Court exercised King's

Bench jurisdiction over electors' petition for mandamus, and granted mandamus relief in part. The Court ordered the Speaker of Pennsylvania House of Representatives to issue forthwith writs of election for special elections to fill vacancies in enumerated legislative districts for remainder of then-current legislative term.

These examples are obvious reminders that the Court's supervisory responsibilities only start at relatively mundane tasks relating to temporary assignments of judges to fill vacancies on the bench, priority of commission, or judicial assignments to divisions within a trial court, and related adjudicatory obligations. See, e.g., PA. CONST. art. V, §§ 10(a), (e); Avellino I, 690 A.2d at 1141 ("Because the authority [of trial court's administrative judge] under which [judicial] assignments [to trial court divisions] are made ultimately derives from this Court, review and resolution of any disputes concerning assignments must necessarily be subject to the authority of this Court."). But, the duties of the Court atop the Unified Judicial System transcend these ministerial tasks. The Supreme Court's principal obligations are to conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth. See Franciscus, 369 A.2d at 1194; Avellino I, 690 A.2d at 1143; accord In re Melograne, 888 A.2d 753, 757 (Pa. 2005) (disbarment is strongly considered sanction when "attorney who holds judicial office commits misconduct that affects the fairness of an adjudication"). "Under our system of government by law, the business of the court should therefore always be so conducted as to command the respect of the people, even in cases where some or many of them are not willing to accept its judgments or decrees as correct; and hence it is but a truism to say that these requirements are almost or quite as essential as the judicial system itself, if the stability of the government, under that system, is to be maintained." Summers, 114 A. at 527. The highest standard of professional and personal ethics and propriety is essential to

maintain the confidence of the citizenry in the judicial system of the Commonwealth. See Franciscus, 369 A.2d at 1194. This Court takes seriously the observation of the Rev. Henry Ward Beecher: "[i]f you should take all the robes of all the good judges that ever lived on the face of the earth, they would not be large enough to cover the iniquity of one corrupt judge." HENRY WARD BEECHER IN THE PULPIT 96 (Hugh R. Haweis ed., 1886).

It bears reiteration that the Court's King's Bench authority and jurisdiction encompass, supplement, and transcend the other powers and jurisdiction enumerated in the 1968 Constitution and the Judicial Code. As a corollary, the Supreme Court is neither divested of its King's Bench powers, nor is the supreme and general nature of these inherent powers limited, unless the divestiture or limitation is clearly expressed or necessarily implied in the Constitution. Avellino I, 690 A.2d at 1143; accord Stander, 250 A.2d at 487 (Roberts, J., concurring) ("judicial power reposed in this Court will continue as before, unimpaired by any mistaken notion that the Legislature has the constitutional authority to diminish, curtail or interfere with its functions"). In Avellino I, the Court explained that sixteen years earlier, the Franciscus Court had held that the Court's supervisory power over inferior tribunals had neither been revoked nor diminished by the adoption of Article V, Section 18 and the creation of the JIRB. The Avellino I Court then rejected the claim that the alteration of the disciplinary process, which implicated the abolition of the JIRB in favor of creating the Judicial Conduct Board and the CJD, necessarily indicated the intent of legislators and the people to diminish the Supreme Court's King's Bench power. According to the Court, "had the people intended to revoke or diminish that power in amending Section 18, the amendment would have explicitly so provided." 690 A.2d at 1143; accord Apex Hosiery Co. v. Philadelphia County, 200 A. 598 (Pa. 1938) (Article III, Section 23 did not implicitly

remove inherent authority of Supreme Court to grant change of venue; only effect statutes adopted pursuant to Article III, Section 23 have is to confer upon trial courts power to change venue, power which they did not inherently possess); JCB Subpoena, 703 A.2d at 463 (Article V, Section 18 did not implicitly divest Commonwealth Court of power or jurisdiction to enforce Judicial Conduct Board's witness subpoena); McCloskey, 2 Rawle 369, 379-80 (statute giving local elected officials "full power and authority" to approve or set aside election did not implicitly remove Supreme Court's supervisory and King's Bench authority to determine right to office following election via writ of *quo warranto*); Respublica, 3 Yeates 93, 1800 WL 2553 at *4 ("There was a strong necessity for giving [lower court judges] the authority of justices of the peace, by the express words of the [C]onstitution, because it was intended that a new power should be superadded to their offices; but that reason does not hold in our case, the members of this [C]ourt having uniformly exercised the power, near seventy years before[,]" by virtue of King's Bench).

Similarly, the Constitution provides that the Supreme Court exercises all jurisdiction vested in the Court at the time of the adoption of the 1968 Constitution, until otherwise provided by law. PA. CONST. SCHED. art. V, § 1. Jurisdiction granted **by statute** may be removed by the General Assembly or via constitutional amendment, either expressly or by necessary implication. See McCloskey, 2 Rawle at 379-80. By comparison, the jurisdiction necessary to the exercise of the Court's King's Bench powers -- constitutionally-granted powers that are by nature comprehensive and inherently vested in the highest authority of the judicial branch -- may be divested only by the people, expressly or by necessary implication. See Ebersoll, 3 Binn. at 531 ("It is fully settled that the jurisdiction of the Court of King's Bench is not ousted unless by express words."); accord Stander, 250 A.2d at 487 (Roberts, J., concurring) (General

Assembly has no constitutional authority to diminish, curtail or interfere with functions of Supreme Court); Robinson Twp., 83 A.3d at 977 (citing Commonwealth ex rel. Carroll v. Tate, 274 A.2d 193, 196–97 (Pa. 1971)) (General Assembly has no authority to remove by statute attributes of governmental entity implicitly necessary to carry into effect entity's constitutional duties).

### V. Exercise of King's Bench Authority in this Case
### A. Petitioners' Challenges to the Court's Authority

As a general matter, "[j]urisdiction is the predicate upon which consideration of the merits must rest" and is the default threshold issue of any decision. Riverlife Task Force v. Planning Comm'n of City of Pittsburgh, 966 A.2d 551, 556-57 (Pa. 2009). That is the case because most parties appear in a judicial tribunal to resolve a dispute, over which a tribunal of proper competence must exercise jurisdiction. The proceedings before us, however, commenced with the exercise by this Court of its authority at King's Bench as manifested in the order relating to the suspension of Judge Bruno. The orders generated a subsequent dispute, which is now before the Court. Accordingly, our analysis necessarily begins with the issue of whether the Court had the authority -- at King's Bench or otherwise -- to issue its initial order. See Vine, 9 A.3d at 1165 (court's power or authority measures capacity to order or effect certain result). As will become apparent from our analysis, determining whether the Court had the capacity to issue such an order is a necessary predicate to determining whether the Court has the competency to decide matters in the general class of controversies to which the dispute now before the Court belongs.

The main thrust of petitioners' argument is that, in suspending Bruno, the Supreme Court acted to discipline the jurist; but, petitioners argue, the authority to

discipline a jurist is vested exclusively in the CJD by the Constitution of 1968, as amended in 1993. The exclusive "disciplinary" power of the CJD, according to petitioners, is a carve-out from the "supervisory and administrative" authority of the Supreme Court. Petitioners make the dual claim that the Supreme Court has **never** had the power to discipline jurists and that, if that power ever existed, it was removed by the "dramatic" revision of 1993 to Article V, Section 18. According to petitioners, the Supreme Court may now act in a disciplinary case only on appeal from the CJD, and under an "extremely" limited standard of review. Petitioners essentially claim that this Court usurped the exclusive constitutional authority of the CJD by ordering the interim suspension of Bruno (and also by ordering the appointment of a special master and raising the prospect of a temporary suspension in the related Solomon matter). The AOPC and PBA respond that the Supreme Court issued a suspension order to Bruno in a supervisory capacity, premised upon its King's Bench authority. According to the AOPC and the PBA, Section 18 of Article V created a disciplinary system for jurists, but there is nothing contradictory about having a disciplinary authority vested in the CJD and the concomitant exercise of the Supreme Court's supervisory and administrative power over the same jurist. The AOPC and the PBA suggest that the Court's authority to investigate and suspend a jurist is consistent with its overarching responsibilities and the necessity of ensuring the integrity of the Unified Judicial System. Having already surveyed at length this Court's powers, there can be little doubt that the core position of the AOPC and the PBA is correct.

We begin by observing that petitioners create a false dichotomy in suggesting that the Supreme Court is categorically prohibited to act in these matters in a way that may be characterized as "disciplinary" rather than "supervisory/administrative"; petitioners would have the decision turn on whether the action of the Court involving a

jurist may be characterized as punitive in the abstract. The proper focus of our inquiry is, instead, on whether the Supreme Court has the constitutional authority to proceed against a jurist in this fashion and, if that power exists, whether it may be exercised by, *inter alia*, ordering the temporary or interim suspension of the jurist.[22] We conclude that the Supreme Court has the authority at King's Bench to order the interim suspension of a jurist, independent of the CJD's authority to suspend the jurist pending criminal or other charges, or to adjudicate disciplinary charges against the same jurist, upon referral by the Judicial Conduct Board.

The Supreme Court's supervisory power over the Unified Judicial System is beyond question. See, e.g., Respublica, 3 Yeates 93, 1800 WL 2553 at *4; accord 42 Pa.C.S. § 502 (citing Judiciary Act of May 22, 1722, 1 Smith's Law 131). This power implicates a dual authority: (1) over personnel of the system, among them jurists; and (2) over inferior tribunals; both aspects are ultimately relevant to address petitioners' complaints. Compare 42 Pa.C.S. § 1723 with 42 Pa.C.S. § 1724. The two facets of the

---

[22] The decisions in Franciscus, Avellino I and Avellino II, McFalls, and Merlo are consistent with our approach. In Franciscus, the Court explained:

> The order [of suspension] which this petitioner seeks to vacate was not meted out as a form of punishment. Rather, we are constrained to exercise our powers of supervision under the circumstances present here in order to guard and protect the just rights and independence of the bar, the dignity and authority of the court, and the safety and protection of the public.

369 A.2d at 1195 (internal quotation marks and footnote omitted); accord Avellino I, 690 A.2d at 1143-44 (sanctions necessarily available to ensure effectiveness of Supreme Court's supervisory powers); Avellino II, 690 A.2d at 1145; McFalls, 795 A.2d at 373; Merlo, 17 A.3d at 871. In each instance, the Court was characterizing the nature of its action in relation to the jurist, rather than speaking of any categorical approach premised upon the type of remedy ordered, as petitioners would have it.

Court's supervisory authority are aspects of the King's Bench power that, although recognized by the 1968 Constitution and the Judicial Code, pre-date the adoption of those laws. In practice, the express articulation of the Court's supervisory authority in our governing charter altered neither its constitutional effect nor its attributes as a power of the King's Bench. Stander, 250 A.2d at 483; id. at 487 (Roberts, J., concurring); see PA. CONST. art. V, §§ 2, 10; PA. CONST. SCHED. art. V, § 1 (all powers at King's Bench continued).

Stated otherwise, the Supreme Court exercises the express supervisory authority in Article V, Section 10 as it would any other power at King's Bench. We have examined at length the nature and breadth of this Court's King's Bench power. The exercise of that power does not exclude actions that may be perceived as punitive, and thus, we respectfully reject petitioners' invitation to interpret our supervisory authority over judicial personnel narrowly, on the ground that the King's Bench power had not been applied in that manner before ratification of the 1968 Constitution and was, as a result, "untried and untested."[23] That the Court had not spoken in a published opinion to its authority to suspend jurists (or to take any action that could be perceived as punitive) before the ratification of the 1968 Constitution does not preclude recognition and enforcement of the constitutional authority of the Court at King's Bench as originally

---

[23] For the purposes of decision, we assume the accuracy of petitioners' proposition that the Court did not exercise its King's Bench powers to suspend a jurist before the ratification of the 1968 Constitution. We nevertheless note, for accuracy, that not all decisions and orders of the Court are published, in particular those of earlier days. We also note that we cannot simply assume that the same matters of grave and timely importance facing the Court in recent years -- consider the example of former Judges Ciavarella and Conahan in Luzerne County -- presented themselves to our judicial predecessors. See ICJJ, 988 A.2d 1269. We cannot allow the absence of specific judicial precedent to impair our own core duties brought about by the necessities of this day and age.

understood. Robinson Twp., 83 A.3d at 950; see District of Columbia v. Heller, 554 U.S. 570, 625 (2008). The Court has explained the prudential principle at work: "our decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court." Determinations spring from the facts of the case; however, the Supreme Court's "task is not simply to decide th[e] case [before it], but also to provide [prospective] guidance upon the broader legal issue." Scampone v. Highland Park Care Center, LLC, 57 A.3d 582, 604-05 (Pa. 2012) (citing Maloney v. Valley Med. Facilities, Inc., 984 A.2d 478, 489-90 (Pa. 2009) and Thierfelder v. Wolfert, 52 A.3d 1251, 1264 n.9 (Pa. 2012)).

As a substantive matter, established precedent pre-dating 1968 described the King's Bench power in the broadest of terms when providing prospective guidance regarding the legal principle at issue. We would be remiss to interpret the Court's supervisory authority at King's Bench in narrow terms, contrary to precedent and the transcendent nature and purpose of the power. The Court long ago warned against any judicial inclination to narrow that authority, lest the members of the Court abandon their duty to exercise the power they hold in trust for the people. See Chase, 41 Pa. at 411. From its adoption by the Commonwealth's colonial government, the power of the King's Bench was intended to be supreme and general, and was understood to transcend forms of procedure and requirements of action upon particular writs. See Schmuck, 70 A. at 1092. Such a broad articulation of the King's Bench power obviously admits the use of the Court's supervisory authority to inquire into issues affecting the lower courts and to suspend jurists, where that remedy is deemed necessary and appropriate. Petitioners offer no convincing legal or logical support for the proposition that the large

supervisory charter of the Supreme Court cannot embrace the interim suspension of jurists.[24]

The effect of the 1993 amendment to Article V, Section 18, as relevant to the Court's King's Bench power, at least, is negligible. Petitioners are correct that the 1993 amendment to Article V, Section 18 realized an overhaul of the formal process for

---

[24]    Petitioners cite the Court's decisions in Bowman, 74 A. 203, and Gamble, 62 Pa. 343, for the proposition that this Court has held that the methods for removal of jurists from office expressly included in the Constitution are exclusive and the Supreme Court is absent from the process. See Board's Brief at 28-29. These matters are distinguishable. Both Bowman and Gamble implicated the constitutionality of acts of the General Assembly that purported to permit removal of judicial officers from office by means other than those articulated in the Constitution. In Bowman, the General Assembly authorized courts of common pleas to declare vacant an office of a justice of the peace who failed for more than six months to reside or maintain an office in the district where he was elected. 74 A. at 204. In Gamble, the General Assembly repealed a statute that had created the judicial district to which the jurist had been elected, thereby removing the jurist from his office as president judge of the abolished district. 62 Pa. at 345. In both instances, the Supreme Court held that the statutes in question violated constitutional provisions that expressly directed the means by which the legislative branch may remove members of the judicial branch from office. The Bowman Court said that "[a] constitutional direction as to how a thing is to be done is exclusive and prohibitory of any other mode which the Legislature may deem better or more convenient." The Gamble Court, meanwhile, explained the substantial separation of powers concerns that justified its holding.

Petitioners suggest that, in acting in the Bruno matter, this Court fails to abide by the same principle because Section 18 of Article V articulates the exclusive means of suspending a jurist. But, Article V, Section 18 addresses the circumstances and means by which the CJD, a body of limited powers -- and not the Supreme Court -- may suspend a jurist. And, as the AOPC has noted, the word "exclusive" simply does not appear in the provision; petitioners read it into the text. There is no constitutional provision that places restrictions on the Supreme Court similar to those on the General Assembly respecting the ability to restrict a judicial officer's exercise of his or her office by removal, suspension, or otherwise. Moreover, the exercise of the Court's supervisory authority in this respect does not implicate the separation of powers concerns that undergird the restrictions on the General Assembly upon which the Gamble decision elaborated.

disciplining jurists. <u>Compare</u> PA. CONST. art. V, § 18 (1993) <u>with</u> PA. CONST. art. V, § 18 (1968). As amended, the provision abolished the disciplinary process by which the Supreme Court imposed judicial discipline in cases brought to us upon the recommendation of the JIRB. Section 18 now describes a "self-contained system for the investigation, prosecution, and imposition of discipline in cases of judicial wrongdoing." <u>Commonwealth ex rel. Judicial Conduct Bd. v. Griffin</u>, 918 A.2d 87, 94 (Pa. 2007) ("<u>Griffin</u>"). The initial adjudicatory authority in disciplinary matters under the new scheme is the CJD. The CJD is a court of record of limited scope -- an appointed tribunal within the judicial system whose functions are deliberately enumerated. <u>See</u> PA. CONST. art. V, § 18(b)-(c); <u>accord</u> <u>Griffin</u>, 918 A.2d at 94 (describing in similar terms prosecutorial function of Board). As a general rule, jurists have the right to appeal an adverse decision of the CJD to the Supreme Court. The provision also seeks to ensure basic conditions of fairness in the adjudication of formal disciplinary grievances lodged against jurists. <u>See</u>, <u>e.g.</u>, PA. CONST. art. V, § 18(b)(5) (due process). That the 1993 amendment transformed the disciplinary apparatus and process in Pennsylvania is beyond dispute. We disagree, however, with the inferences petitioners derive from this structure and with the meaning that petitioners attribute to Article V, Section 18, as amended, as against this Court's inherent powers.[25]

---

[25] In their briefs, petitioners cite portions of the legislative debates on Article V, Section 18 in 1993, which support this undisputed notion of an overhaul of the disciplinary system. Petitioners claim that debate rhetoric addressing the "dramatic" nature of the amendment support their opinion that the Supreme Court was "stripped" of any authority to act in matters such as <u>Solomon</u> and <u>Bruno</u>, <i>i.e.</i>, matters where the Board and the CJD might act. Petitioners' reliance on the debates is of questionable value as the statements they quote, unencumbered by petitioners' gloss, offer no insight regarding the issues actually before the Court today. <u>See</u> Board's Brief at 55-57; Solomon & Bruno Brief at 26-28.

(continued…)

Article V, Section 18 provides no textual predicate for petitioners' assertion that the drafters and the ratifying voters intended the 1993 amendment to oust the supervisory authority of the Court over judicial officers suspected of or chargeable with wrongdoing. For the ouster of King's Bench authority to be effective, the intent of the ratifying voters must be expressed or necessarily implied by the constitutional language itself. Avellino I, 690 A.2d at 1143; McCloskey, 2 Rawle at 379-80. Such intent is plainly not expressed: the Supreme Court's King's Bench powers simply are not among the subjects addressed by Article V, Section 18. See generally PA. CONST. art. V, § 18.

Nevertheless, petitioners argue that the creation of the self-contained disciplinary apparatus and installation of the CJD as an adjudicatory authority in formal disciplinary cases, necessarily implies that the Supreme Court has been divested of power in all

_____

(…continued)

We also note that petitioners' recounting of the legislative debates is so selective as to undermine their argument. For example, petitioners emphasize statements in support of defeated amendments -- which, unlike the 1993 amendment as ultimately adopted by the electorate, proposed that a majority of the Board's and CJD's membership would be appointed by the Governor and that the budget of the disciplinary system would be separate from that of the judiciary -- to suggest that Article V, Section 18 was intended to create a disciplinary process entirely independent of the Judicial Branch. See 1993 Pa. Legislative Journal-House 53, 62 (January 27, 1993) (Piccola amendment). Proponents of the version of Article V, Section 18 that actually **prevailed**, however, emphasized dual principles supporting the 1993 amendment: "first, the independence of the judiciary, and second, the accountability of the judiciary. . . . We should look in the long run and in the long term as to the impact that too strong an independent board would in fact wreck [sic] upon the separation of powers. We cannot risk the intimidation of judges." Parenthetically, what is absent from petitioners' presentations to this Court is any reference to that part of the debate in which the supporters of this prevailing version also noted with disapproval the case of a former jurist who, although suspended by the Court, was not removed from the bench and continued to receive pay for two years after conviction for public corruption. The legislators decried inaction of the sort that petitioners now advocate should be this Court's chosen course. See 1992 Pa. Legislative Journal-House 1513, 1515-16, 1519 (June 24, 1992) (Broujos amendment).

matters implicating judicial wrongdoing. Petitioners claim that the disciplinary apparatus of Article V, Section 18 operates entirely outside the inherent authority of the Supreme Court, and that the CJD's authority is paramount and exclusive in cases implicating judicial wrongdoing. We respectfully, but no less fundamentally, disagree: the structure of the disciplinary apparatus and the nature of the CJD make clear that the CJD is a judicial body inferior to the Supreme Court, like every other tribunal within the Unified Judicial System. PA. CONST. art. V, §§ 1, 2(a), 18(b)(5). The Supreme Court -- via its inherent and exclusive constitutional supervisory power at King's Bench -- keeps inferior tribunals, including the CJD, within the bounds of their authority. Onda, 103 A.2d at 91; see also Bell, 152 A.2d at 735. By comparison, the CJD is an entity of extremely limited powers, possessing no inherent authority but only that authority expressly conferred upon it by Article V, Section 18. Also worth noting is that, as we have explained, the power to articulate substantive standards governing judicial conduct is vested in this Court, both by promulgation of codes of conduct and our appellate decisions in matters of judicial discipline. Any adjudicative discretion reposed in the CJD is cabined by these standards. Neither adjudicative discretion, nor for that matter the CJD's authority to promulgate procedures governing the disciplinary proceedings before it, authorize deviation from the substantive standards of conduct articulated by this Court. That the CJD has the enumerated power to discipline Pennsylvania jurists, including justices of the Supreme Court, in matters that the Judicial Conduct Board decides to pursue, does not act to remove the CJD from the Unified Judicial System, nor does it elevate the CJD by necessary implication above the reach of the Supreme Court's supervision and King's Bench authority. Cf. Apex Hosiery Co., 200 A. at 598; McCloskey, 2 Rawle at 379-80.

By creating a regularly convened apparatus to investigate, prosecute, and adjudicate formal matters involving allegations of judicial wrongdoing, Article V, Section 18 did not impair the Supreme Court's supervisory powers over personnel of the Unified Judicial System, including judicial officers, although it certainly reduced the occasion for the use of these powers to extraordinary circumstances. See Fahy, 737 A.2d at 224 (Court's power to grant *habeas corpus* relief); Reilly, 188 A. at 581 (Court's power to grant change of venue relief); accord Balph, 3 A. at 230 (King's Bench jurisdiction is not exercise of original jurisdiction). In the regular course of its business, the Judicial Conduct Board receives and investigates complaints of judicial conduct, and may initiate proceedings against Pennsylvania jurists. The CJD adjudicates those complaints. We have no doubt that the diligent operation of the Board and the CJD over the last twenty years has contributed significantly to maintaining high standards of integrity and professionalism for judicial officers in Pennsylvania. This two-tiered disciplinary process also has the advantage of preserving the resources of the Supreme Court, which otherwise would have been obliged to act in every case of judicial wrongdoing pursuant to its supervisory powers. Nevertheless, the existence of the Article V, Section 18 disciplinary process does not encompass and exhaust the Supreme Court's duty to the citizens nor does it discount the Court's authority to act to discharge those obligations. Franciscus, 369 A.2d at 1194 ("As the highest court of this Commonwealth, we would be remiss in our duty if we neglected to exercise our inherent supervisory power on the theory that another means to resolve the problem may be available, when the alternative solution would not adequately meet the exigencies of the circumstances presented.").

Placed in the proper context, the respective constitutional responsibilities and powers of the Supreme Court and of the CJD emerge plainly. It is also important to

note, however, that the fundamental distinction between this Court and the CJD is not limited to our different constitutional roles and our places in the constitutional hierarchy. We are well familiar with the core function of the CJD; a large part of our duties involves varying levels of review with respect to decisions of similar adjudicative bodies. These bodies determine the matters that come before them in the ordinary course. This Court, in contrast, has a duty and a perspective that is exponentially broader. The Court's experience has proven the essential and continuing role of our King's Bench authority in addressing extraordinary or emergent circumstances. See examples, <u>supra</u>.

### B.    The Exercise of Discretion in Employing the Court's Supervisory Authority

As we have explained, within the large charter of the King's Bench authority, the Pennsylvania Supreme Court has the capacity to bring its supervisory power to bear swiftly to vindicate its responsibilities to the citizens, in matters affecting the Unified Judicial System. But, it is a very different question of whether and when, in our discretion, we should exercise that power. This litigation -- including in no small part the presentations of the parties and of the PBA -- has brought about a greater appreciation of the fact that the Article V, Section 18 process has diminished the necessity and reduced the occasion for use of these powers to extraordinary circumstances. We have confidence that the standardized procedure of Article V, Section 18 will, in the vast majority of circumstances, adequately respond to punitive concerns **and** the necessities of protecting the integrity of the Unified Judicial System, against judicial impropriety and the appearance of judicial impropriety.

Having explained that the King's Bench authority persists, we need not decide here what circumstances are sufficiently extraordinary to demand the exercise of that

authority in a supervisory context. Judge Bruno has been acquitted, and we have vacated our suspension order. The law in this area can develop incrementally, should the occasion arise. We write now to note some general concerns illustrated by the parties' presentations.

In determining whether to exercise the discretion to act in matters implicating judicial misconduct, and in calibrating a response to specific incidents of misconduct, the critical inquiry is what impact the alleged or established judicial wrongdoing and its aftermath may have on subsequent actions of the jurist on the bench, how these actions affect and reflect upon the Unified Judicial System generally, and what measures may be required to instill confidence in the citizenry that the delivery of fair and even-handed justice will not be poisoned. Accord Joseph, 987 A.2d at 634 (quoting McFall, 617 A.2d at 714) ("A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety."). The Court has discretion in fashioning the appropriate remedy.[26]

Our discretion is cabined primarily by the interests we have already examined: supervisory orders issued upon judicial personnel must be congruent with our ultimate responsibility to maintain the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system in Pennsylvania. The countervailing consideration implicates due process or fairness concerns. See City of Philadelphia,

---

[26] The remedy at issue in the Bruno matter is the interim suspension of the jurist without pay. Article V, Section 18 permits the Board to request, and the CJD to grant, this type of relief via a standardized procedure that reduces the necessity for the Court to act in a similar fashion. We note, however, that the range of remedies available to this Court as an administrative or supervisory matter is broader, in accord with the powers at King's Bench. Available remedies would include, for example, removal from duties to preside over cases, administrative leave, and also interim suspension in extraordinary cases.

999 A.2d at 563 ("no adjudicatory body has unlimited discretion, and each and every adjudicator is bound by the Constitution and particularly by the mandates of due process"); accord In re Hasay, 686 A.2d 809, 815 (Pa. 1996) (disciplinary matter is civil proceeding but, in light of severity of potential sanctions, recognize that jurist is "clothed with the fundamental constitutional rights available to criminal defendants").

We do not take the prospect of exercising our supervisory power or of imposing sanctions upon a jurist lightly. We are judges as well. We approach cases aware of the presumption of innocence attending criminal charges and mindful of the obligation that our supervisory intervention be fair to the jurist. Nevertheless, in appropriate cases, any private interest of the jurist in continuing to preside over cases, and, furthermore, to receive compensation if suspended, may have to yield to the public interest of protecting the fairness and probity of the judicial process, and the integrity, dignity, and authority of the Unified Judicial System. See Franciscus, 369 A.2d at 1194; Avellino I, 690 A.2d at 1143; see also 1 Pa.C.S. § 1922(5). We have explained that "[a] judicial office represents a public trust," and the conduct of a judicial officer in the decision-making process and in his or her private life may "stain[] the integrity of the position" and "bear[s] upon the independence and integrity of the judiciary." Carney, 79 A.3d at 506. Those holding the privileged office of judge should be acutely sensitive to situations that may impugn the integrity and dignity of the office, and thereby of the judiciary as a whole. And so, for example, jurists should hold themselves to a standard higher than one of merely avoiding a felony conviction; conduct leading to a colorable felony charge is sufficient to implicate the supervisory authority of this Court. The failure of a judicial officer to appreciate the seriousness and effect on the entire system of his or her conduct raises questions as to the competency of that individual to hold judicial office. Cf. Matter of Cunningham, 538 A.2d 473, 482 (Pa. 1988) (receipt of cash for favorable

adjudication prohibited by canons of judicial conduct; reject claim that Canon 1 of Code of Judicial Conduct was not violated because language was aspirational and vague, and did not specifically address circumstances at issue: "one who asserts his or her competency to hold judicial office [should not] have difficulty in understanding concepts such as 'integrity,' 'independence' and 'impartiality'").[27, 28]

---

[27] Parenthetically, we note that this Court also exercises its supervisory power over judicial officers in its adoption of the Code of Judicial Conduct and the Rules Governing Standards of Conduct of Magisterial District Judges. The last few decades have witnessed this Court implementing increasingly more comprehensive prophylactic rules respecting judicial conduct. See, e.g., Final Report at 3 (noting that Court directed review of existing rules of judicial conduct in light of Luzerne County events). In drafting these rules, we persist in the aspiration that the judicial office summons in those who serve the highest quality of professionalism and personal comportment. Yet, situations find us that defy these lofty expectations and call for judicial discipline or supervisory action, and further refinement of the rules. The exercise of the transcendent King's Bench power in individual cases permits the Court to address novel, extraordinary circumstances for which the existing rules of judicial conduct may not yet provide. "The mere knowledge that such a power exists in th[e Supreme C]ourt it is believed will make its frequent use unnecessary." Balph, 3 A. at 230. As a corollary, we note that not only the formal rules and the spirit in which they were drafted, but also each case of judicial wrongdoing and attendant disciplinary and supervisory actions puts judges on notice of the potential pitfalls and consequences of judicial wrongdoing.

[28] With respect to the issue of consistency in the actions of this Court and the CJD, petitioners have stressed the fact that the language of Article V, Section 18 does not permit an appeal to this Court from an interim order of the CJD. See PA. CONST. art. V, § 18(d)(2) ("An interim order under this paragraph shall not be considered a final order from which an appeal may be taken."). However, that restriction is not a limitation on this Court's King's Bench authority over an inferior tribunal to review such an order *sua sponte* or upon application of the Board or of the jurist for the exercise of extraordinary jurisdiction. And, as in other areas, we can exercise the power to ensure consistency in review paradigms. See discussion and examples cited in Part IV, supra.

## VI. The Jurisdiction of the Supreme Court

We also address whether the Court is competent to determine controversies in the general class to which the Bruno matter belongs.[29] Petitioners argue that the Supreme Court lacks jurisdiction because such disputes implicate the discipline of jurists, over which jurisdiction is vested exclusively in the CJD by the Pennsylvania Constitution. According to petitioners, Article V, Section 18 explicitly divested the Supreme Court of jurisdiction over judicial discipline matters. Petitioners then seek to distinguish Franciscus and Avellino as supervisory or administrative (rather than disciplinary) matters, over which petitioners concede the Court has jurisdiction. The AOPC and the PBA question petitioners' approach. According to the AOPC and the PBA, irrespective of the disciplinary process created by Article V, Section 18, the Court has jurisdiction at King's Bench to act.

We have already announced and explained our conclusion that the Supreme Court has the **authority** to order interim suspensions pursuant to the Court's supervisory authority. Nevertheless, we address petitioners' overarching claim that any controversy that may be characterized as "disciplinary" is within the exclusive original jurisdiction of the CJD.

---

[29] There is an apparent contradiction between petitioners' argument that the Court lacks jurisdiction over that general class of cases to which the Bruno matter belongs and their acquiescence in the exercise of the Court's jurisdiction. For the reasons we explain, we hold that the Court has jurisdiction. Indeed, if it were otherwise, an adjudication on the merits of the dispute would be inappropriate, because "[a] party, or the parties by agreement, may not vest subject matter jurisdiction in a court which does not have it otherwise." Mercury Trucking, 55 A.3d at 1066 (citing Smethport Area Sch. Dist. v. Bowers, 269 A.2d 712, 715 (Pa. 1970)). Equally importantly, we note that the issues which we ordered briefed were articulated in terms of "jurisdiction." Although, as we explain, the central dispositive principle implicates the Court's "authority," we acknowledge that the parties' briefs have implicated both questions of authority and jurisdiction, and so we proceed to address the jurisdiction question.

We recognize that Article V, Section 18 grants the CJD "original" jurisdiction over those causes of action implicating Board-initiated prosecutions of misconduct charges against jurists; the Supreme Court has "appellate" jurisdiction in such cases, with a limited exception not applicable here. See PA. CONST. art. V, § 18(b)-(c). Article V, Section 18 does not purport to allow the CJD to take cognizance of any other type of action.

A dispute in which a jurist challenges the Supreme Court's exercise of its supervisory authority to investigate and/or suspend the jurist is a type of action distinct from that which is subject to the CJD's original jurisdiction. In such cases, as in Bruno, the Board is not the prosecuting body. Rather, the Supreme Court's decision to exercise its supervisory power is what gave rise to the dispute now before the Court. Petitioners concede, and there can be no reasonable dispute, that this Court is competent at King's Bench to review and resolve disputes that implicate the Court's exercise of its supervisory and administrative powers over jurists, including members of the minor judiciary. See Avellino I, 690 A.2d at 1141 (where authority for administrative decision derives from Court, resolution of dispute is necessarily within jurisdiction of Court); see, e.g., Carbon County Judicial Vacancy, 141 A. at 250 (exercise of King's Bench jurisdiction relating to temporary assignments of judges to fill vacancies on bench); President Judge for 30th Judicial Dist., 216 A.2d at 326 (exercise of King's Bench jurisdiction relating to establishment of priority of commission).

As we have already explained, the exercise of King's Bench jurisdiction is distinct from the exercise of the Court's original jurisdiction. Balph, 3 A at 230 (King's Bench jurisdiction "is not, strictly speaking, original jurisdiction"); accord 42 Pa.C.S. § 721 (original jurisdiction of Court). At King's Bench, the Court may take cognizance over any civil matter statewide, regardless of whether the matter is pending before an inferior

tribunal.  See Summers, 114 A. at 528.  Article V, Section 18 of the Constitution is not to the contrary because it simply addresses the narrow jurisdiction of the CJD over Board-prosecuted cases of judicial misconduct.  The provision neither expressly, nor impliedly, purports to restrain the exercise of King's Bench jurisdiction by this Court.  See Ebersoll, 3 Binn. at 531 (comprehensive jurisdiction at King's Bench may be ousted only by express words).

Accordingly, the Court's supervisory action with respect to a judicial officer is separate from any disciplinary proceeding that the Judicial Conduct Board may initiate and disciplinary sanction that the CJD may ultimately enter against the same jurist pursuant to their respective Article V, Section 18 authorities.  The distinct nature of the proceedings before the CJD and proceedings at King's Bench has two practical implications.

First, the principle of concurrent original jurisdiction is inapplicable here. Concurrent jurisdiction refers to the notion that two tribunals share the competency to determine controversies of the general class to which the case under consideration belongs.  See, e.g., Dep't of Pub. Welfare v. Presbyterian Med. Ctr. of Oakmont, 877 A.2d 419 (Pa. 2005).  Bruno is in the general class of controversies that implicate the jurisdiction at King's Bench, which is exclusively vested in the Supreme Court.  See Avellino I, 690 A.2d at 1141; Bell, 152 A.2d at 735.  The CJD's jurisdiction is limited to the adjudication of matters enumerated in Article V, Section 18, *i.e.*, Board-prosecuted charges of judicial misconduct.  Whether the Supreme Court may also take cognizance over matters committed generally to an inferior jurisdiction, *i.e.*, the CJD, in the exercise of King's Bench jurisdiction or of concurrent original jurisdiction is not an issue implicated in the actions before us.  Cf. Griffin, 918 A.2d at 94-95 (power of Judicial

Conduct Board delineated to include prosecution of judicial misconduct before CJD but not *quo warranto* action). See Pollard, 17 A. at 1090.

Second, even where this Court would choose to act, in an extraordinary matter, the Board may continue to pursue sanctions before the CJD. The Supreme Court's exercise of its supervisory authority does not intrude upon the CJD's constitutional authority to mete out disciplinary sanctions upon jurists, nor does it preclude the CJD from imposing disciplinary sanctions upon a later Board-filed complaint. See Merlo, 17 A.3d at 871. The constitutional powers of the Supreme Court and the CJD, and the legal predicates for their respective actions, are distinct and may comfortably operate separately. That the remedies available to the Supreme Court and the CJD are similar in some instances -- such as temporary suspensions or interim suspensions -- does not equate to exposing a jurist to two "disciplinary sanctions" for the same conduct, as petitioners suggest. Properly understood, any such supervisory action is not punishment, but instead represents action undertaken to preserve the integrity of the judiciary. Moreover, because the supervisory action does not punish a jurist for alleged misconduct, and as no decision of the CJD is before the Court for review, we also reject petitioners' argument that the Court would be placed in a position of appearing to have prejudged an appeal from the CJD's ultimate disciplinary decision. The issues are distinct: on appeal, the Supreme Court reviews the decision of the CJD for error on the law or facts and for whether the sanctions imposed were lawful; in a supervisory action, the Court is guided by the duty to safeguard the fairness and integrity of the Unified Judicial System. Compare PA. CONST. art. V, § 18(c)(2) with Avellino I, 690 A.2d at 1143.[30]

---

[30] The question of whether the Supreme Court may exercise another facet of King's Bench jurisdiction -- extraordinary jurisdiction -- to take cognizance of a matter pending before the CJD is a separate issue. See 42 Pa.C.S. § 726. That question implicates (continued…)

Finally, we reject Judge Bruno's suggestion that notions of fairness require the Supreme Court to refer all matters like these to the Board and the CJD, respectively, for further investigation and hearing. Having already rejected the jurists' claims of *per se* due process violations in the processes employed by the Court, we simply note that the Court certainly had the authority and discretion to rely on or defer to the disciplinary system. At the time we acted, the exigencies of the cases -- viewed in the context of the widespread corruption in the Traffic Court -- and the uncertainty of whether the CJD would act and in what manner, impressed upon the Court the necessity to proceed swiftly.[31] We might prefer that the present situation had not found us; indeed, it is disappointing that any judge in Pennsylvania would think to interfere ex parte in a case (or even act in a fashion that would give rise to an appearance of interfering ex parte in a case). But, such were the allegations which this Court was required to assess in determining whether it was necessary to act, and the life of the law being largely a function of experience, we acted. See OLIVER WENDELL HOLMES, JR., THE COMMON LAW 1 (1881) ("The life of the law has not been logic: it has been experience.").

_____

(…continued)

the supervisory power of this Court over the CJD, an inferior tribunal, and is not before us. See, e.g., Joseph, 987 A.2d at 636. We note that, in a case in which the Court exercises extraordinary jurisdiction over a pending matter, the exercise of the Court's jurisdiction would preempt proceedings before the CJD. See, e.g., Carpentertown, 61 A.2d at 428. This is not the scenario presented to the Court here, since the Court and the CJD are acting independently, within their separate respective spheres of authority.

[31] The Court may assume plenary jurisdiction in a matter pending before an inferior tribunal pursuant to Section 726 of the Judicial Code. See 42 Pa.C.S. § 726. This provision is inapplicable. The Court assumed plenary jurisdiction immediately without knowing whether, if, or when a disciplinary action might be pursued before the CJD; accordingly, the Court exercised its King's Bench powers rather than extraordinary jurisdiction.

Having said this, the Court nevertheless is suitably appreciative of the reassuring swiftness and responsibility displayed by both the Judicial Conduct Board and the CJD in this matter. We are also cognizant of the salutary benefits of avoiding even the prospect of competing orders arising from the same basic conduct. The *sui generis* nature of this appeal has provided an unforeseen opportunity at dialogue and greater understanding for all entities. As a result of the process, which included excellent advocacy from all participants, this Court will surely proceed in future such matters with a greater awareness and sensitivity to the issues (and inherent tensions) which have been so ably articulated to us.

## VII. Hierarchy of Authority

Last, we address a question upon which we have already touched in part: when an order of the Supreme Court and an order of the CJD relating to the suspension of a jurist conflict, which order takes priority?

Petitioners reiterate their absolutist position that the Supreme Court is prohibited from acting in "disciplinary" matters and that, as a result, only the CJD's orders are valid and should be enforced. Petitioners suggest that the Supreme Court has already acknowledged this constitutionally-derived system by ordering continued payment of Judge Bruno's salary and "essentially enforc[ing] the CJD's order." Judge Bruno adds that inconsistent adherence by the AOPC to directions regarding pay -- withholding pay each time, whether upon order of this Court or of the CJD -- harms the public perception of the Unified Judicial System. The AOPC and the PBA reject the notion that the Court must defer to the CJD because the Court is the supreme judicial power in the Commonwealth and its orders may not be disturbed by an inferior tribunal. Where the Supreme Court has made a decision, that decision is "preeminent," according to the

AOPC. While remaining sensitive to the concerns we articulated at the conclusion of the prior section of this Opinion, where there is such a conflict, we agree with the core position of the AOPC and PBA.

As we have explained at length, supervisory actions of the Supreme Court and disciplinary proceedings prosecuted by the Board and adjudicated by the CJD are distinct. The Supreme Court and the CJD have constitutional authority to investigate a jurist and order sanctions, if warranted, where the legal predicates for their respective actions are met. Where the orders of the CJD and the Supreme Court are in accord with respect to the propriety of a suspension and the continuation or withholding of a jurist's pay, the directive to the AOPC is clear.

Where the orders of the Supreme Court and the CJD are dissonant, however, any order of this Court obviously is "supreme." As we explained, the Supreme Court has supreme and general authority over the Unified Judicial System, which includes inferior tribunals and its personnel. See PA. CONST. art. V, § 2(a); 42 Pa.C.S. §§ 502, 1723, 1724. This authority articulated by the 1968 Constitution is derived from the power at King's Bench, inherent only to the Supreme Court. Bell, 152 A.2d at 735. In practical terms, the Supreme Court's broad King's Bench mandate manifests as the power to sanction a jurist as a supervisory matter, see Avellino I, 690 A.2d at 1143, and as the power to keep inferior tribunals within the bounds of their authority, see Onda, 103 A.2d at 91.

Going forward, we expect that our present explanation of the fundamental underpinnings at work, as well as our greater appreciation for the concerns articulated to us in these matters, will help avoid any conflicts between orders of the Supreme Court and the CJD.

This Opinion disposes of the broad constitutional questions presented to us concerning the Court's responsibility, authority, and jurisdiction. Having already vacated the February 2013 Order suspending Judge Bruno without pay, jurisdiction is now hereby relinquished.

Messrs. Justice Eakin, Baer, and Stevens join the opinion.

Mr. Chief Justice Castille files a special concurring opinion.

Mr. Justice Saylor files a concurring opinion, in which Madame Justice Todd joins.

Mr. Justice Baer files a concurring opinion.

Madame Justice Todd files a concurring opinion.

Mr. Justice McCaffery files a concurring opinion.